David P. Sheldon
LAW OFFICES OF DAVID P. SHELDON, PLLC
512 8th Street, S.E.
Washington, D.C. 20003
Telephone: (202) 546-9575
Facsimile: (202) 546-0135
Email: davidsheldon@militarydefense.com

FILED

2008 JUL -2 PM 4: 15

CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY_____DEPUTY

*Attorney for Petitioner*
*David A. Hernandez-Alverado*

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

David A. HERNANDEZ-ALVERADO
Staff Sergeant  (E-6), U.S. Marine Corps
Naval Consolidated Brig, Marine Corps Air Station Miramar
46141 Miramar Way, Suite 1
P.O. Box 452135
San Diego, CA 92145-2135

'08 CV 1184 JM AJB

            *Petitioner,*

v.                                          Case No.

THE HONORABLE
DONALD C. WINTER
Secretary of the Navy
Department of the Navy
1200 Navy Pentagon
Washington, D.C.  20310-1200

            *Respondent.*

*   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *

## PETITION FOR A WRIT OF HABEAS CORPUS

1                    ### I. Jurisdiction And Venue

2        1)  This Court has jurisdiction to issue a writ of habeas corpus pursuant to 28

3    U.S.C. section 2241.

1      2)  Under 28 U.S.C. section 2241(c)(1), a person held in custody by the United

2  States may seek habeas relief.

3      3)  The writ of habeas corpus is the proper procedure for securing the immediate

4  release of a member of the U.S. Marine Corps, where the Corps unlawfully continues to

5  confine the member due to an unconstitutional denial of that member's right to due

6  process.  Burns v. Wilson, 346 U.S. 137 (1953).

7      4)  Venue is proper because Petitioner resides within this judicial district

8  and his primary contacts with Respondent have been in this judicial district.

9  Strait v. Laird, 306 U.S. 341 (1972).

10                           **II. The Parties**

11      5)  Petitioner was a staff sergeant (E-6) in the U.S. Marine Corps.  He is presently

12  confined in the stockade at Naval Consolidated Brig, Marine Corps Air Station Miramar,

13  California.

14      6)  Petitioner was convicted by general court–martial of one specification of

15  burglary, three specifications of indecent assault, two specifications of maltreatment, and

16  one specification of violation of a lawful order, in violation of Articles 92, 93, 129, and

17  134, Uniform Code of Military Justice ("UCMJ").  10 U.S.C. sections 892, 893, 929, and

18  934.

19      7)  Petitioner was sentenced to 15 years confinement, reduction in grade to E-1,

20  and a dishonorable discharge.

21      8)  On review by the convening authority, one specification of indecent assault was

22  dismissed and Petitioner's term of confinement was reduced to 6 years, while the

23  reduction in pay grade to E-1 and dishonorable discharge were affirmed.

1      9) Defendant is the Secretary of the Navy and Petitioner's custodian. <u>Strait v.</u>

2  <u>Laird</u>, 406 U.S. 341 (1972).

3                     **III. Statement Of Facts**

4      10) Petitioner was accused of fraternization with Corporal Tiffany Ann Copeland,

5  USMC, in November, 2001. At that time Corporal Copeland was a twenty-one year old

6  private assigned as a clerk to Maintenance Battalion, Camp Pendleton, California.

7      11) Copeland alleged that although she worked with two other male

8  Marines, Petitioner would rarely speak to them, even though he spoke with

9  Copeland "every day."

10      12) She further alleged that during this time Petitioner would refer to himself by

11  his first name and told Copeland that she could also call him "David," a remark which

12  Copeland stated made her feel "uncomfortable" (despite the fact that she testified on

13  cross examination that, as a PFC, she had dated NCOs).

14      13) In November, 2001 Petitioner invited Copeland to visit him at the bar where

15  he worked.

16      14) Although Copeland replied that she was under the legal drinking age,

17  Petitioner allegedly responded, "Don't worry about it, because I can still get you in."

18  Copeland stated that she then felt that Petitioner was trying to "date" her.

19      15. As a result, these alleged conversations – only reported by Copeland a full two

20  years after their alleged occurrence - were used at trial by the Government to establish a

21  "pattern" of sexual misconduct by Petitioner, with the unsubstantiated alleged

22  "misconduct" culminating in Petitioner's conviction for alleged "burglary" and "assault"

23  upon Christy Stilson.

1        16. In May, 2003, while deployed to Iraq, Petitioner served as staff NCO with

2    Corporal April Zimmer, USMC, who worked as a fabric repair specialist in his squad.

3        17. At Petitioner's trial, Zimmer testified that on the evening of May 19,

4    2003 Petitioner asked her to walk to chow hall with him.

5        18. Zimmer stated that she, Corporal William P. Burgie, and Petitioner went to

6    chow hall together, then left and went to a nearby berm.  According to Zimmer, Petitioner

7    first offered her liquor, kissed her, then tried to undo her belt and put his hand into her

8    pants, actions which allegedly made her feel "scared," "surprised," "very uncomfortable,"

9    and "shocked."

10        19. At the conclusion of trial, Petitioner was thereupon convicted of indecent

11    assault upon Corporal Zimmer.

12        20. However, Corporal Burgie (who had asserted his Fifth Amendment right

13    against self-incrimination so as not to testify) finally agreed to relate the actual events of

14    that evening and stated that he had in fact witnessed Zimmer and Petitioner engaging in

15    consensual sexual relations on the berm, despite falsely testifying at Petitioner's Article

16    32 hearing that he had witnessed no sexual activity between Petitioner and Zimmer at that

17    location.

18        21. As a result of Burgie's testimony, Zimmer was found to have committed

19    perjury and Petitioner's related conviction for indecent assault was overturned.  **Exhibit**

20    **1.**

21        22. The wholly fictitious "assault" was used by the Government at trial to establish

22    a "pattern" of sexual misconduct by Petitioner, which culminated in Petitioner's

23    conviction for an alleged "burglary" and "assault" upon Christy Stilson.

4

23. In July, 2003, Lance Corporal Sera Castaneda, USMC, was assigned to Petitioner's platoon at Camp Pendleton. She stated that she would talk to Petitioner about her family problems and concerns for her well-being, and that Petitioner told her that "anybody would be crazy not to want to be with you," that he liked her eyes, and that she had "a nice body."

24. Castaneda also stated that during some of these conversations Petitioner would rest his hand on her upper thigh, which, she said she told Petitioner at the time, made her feel uncomfortable.

25. Although Castaneda testified at trial that on one occasion Petitioner supposedly "grabbed" her buttocks, in her Article 32 testimony she stated that Petitioner only allegedly "brushed" her.

26. However, although Castaneda never reported any of these alleged events to the other staff sergeant on duty or up the chain of command, these wholly unsubstantiated charges were then used by the Government at trial to establish a "pattern" of sexual misconduct by Petitioner, with Petitioner being convicted of "maltreatment" of Castaneda, and with this alleged "misconduct" culminating in Petitioner's conviction for alleged "burglary" and "assault" upon Christy Stilson.

27. Lance Corporal Tamarijn Walsh, USMC, testified at trial that in July, 2003, while assigned as duty driver to Petitioner's unit, Petitioner allegedly asked her "if her husband satisfied her," told her that he and his wife "no longer had sex," and stated that it had been a long time since Petitioner had "had sex."

1   28. She further alleged that Petitioner told her that she "was pretty," asked her for

2 a kiss, and then allegedly "touched" her butt. She later alleged that Petitioner supposedly

3 "grabbed" her butt, instead of "touched."

4   29. Sgt. Aceves, who was on duty in the immediate area at that time with both

5 Petitioner and Walsh, testified that he saw no inappropriate behavior whatsoever and that

6 Walsh in no way seemed upset; despite this contradicting testimony, these

7 unsubstantiated charges were then used by the Government at trial to establish a "pattern"

8 of sexual misconduct by Petitioner, with Petitioner being convicted of "maltreatment"

9 and "indecent assault" upon Corporal Walsh, and with the wholly unsubstantiated

10 allegations resulting in Petitioner's conviction for alleged "burglary" and "assault" upon

11 Christy Stilson.

12   30. Finally, Christy Stilson alleged that on the night of December 12, 2003, while

13 her husband was on duty, Petitioner unlawfully entered her home and bedroom, reached

14 under the bedcovers, and "rubbed her vagina" while she was asleep.

15   31. Previously that evening, Mrs. Stilson accepted an invitation by Petitioner to

16 watch a movie at Petitioner's home with his family and others, and acted on this

17 acceptance by going to Petitioner's house to watch it.

18   32. About an hour and a half later Petitioner and a neighbor expressed a desire for

19 snacks, and Mrs. Stilson volunteered that she had potato chips in her home that Petitioner

20 could go retrieve. Petitioner then walked over to Mrs. Stilson's home, entered the

21 unlocked front door, and got the bag of chips.

22   33. Mrs. Stilson testified that she went home at about 11 or 11:30 p.m. because she

23 had to go to work in the morning. She stated that she walked home alone, locked the

1   door, and went to bed, only to be awakened at about 2 or 2:30 a.m. by someone (who she

2   supposedly at first thought was her husband) rubbing her vagina.

3       34. Mrs. Stilson stated that she then opened her eyes and looked over, saw that it

4   was Petitioner touching her, and shouted at Petitioner, to which he responded that he was

5   only returning her potato chips.

6       35. Mrs. Stilson alleged that she shouted at Petitioner that she would "shoot him"

7   if he did not leave, at which point Petitioner "ran from the house."

8       36. Mrs. Stilson testified that she then shut and locked the door, got a knife,

9   dressed, and drove across base to report the incident to her husband.

10      37. Sgt. Kiefer subsequently testified that at approximately 3:30 a.m. Mrs. Stilson

11  came in looking upset but not crying, and stated that she had been assaulted.

12      38. Although Defense counsel objected to this hearsay testimony, the court

13  eventually allowed it as an excited utterance.

14      39. Kiefer then testified that it took Mrs. Stilson about five or ten minutes to

15  finally describe the alleged assault.

16      40. At the conclusion of trial, Petitioner was convicted of breaking and entering

17  (burglary) with the intent of assaulting Mrs. Stilson, of indecent assault upon Mrs.

18  Stilson, and of maltreatment and indecent assault upon Corproal Walsh, maltreatment of

19  Corporal Casteneda, indecent assault upon Corporal Zimmer, and violation of a lawful

20  order.

21      41. Subsequently, on November 5, 2004, Petitioner, as stated, was sentenced to 15

22  years confinement, reduction in pay grade to E-1, and a dishonorable discharge.

1    42.  After trial, however, the convening authority found that Corporal Zimmer

2    perjured herself, vacated Petitioner's relevant indecent assault conviction, and reduced

3    his sentence to 6 years incarceration, while reaffirming the reduction in grade to E-1 and

4    a dishonorable discharge. **Exhibit 1.**

5    43.  On appeal to the U.S. Navy-Marine Corps Court of Criminal Appeals,

6    Petitioner asserted seven assignments of error: (a) that the military judge erred in denying

7    a Government request to replace the trial defense counsel due to counsel's inability to

8    provide timely representation; (b) prosecutorial misconduct; (c) that the military judge

9    erred in denying Petitioner's challenge for cause against service by the enlisted

10    representative on the trial panel; (d) the legal and factual insufficiency as to the finding of

11    guilt regarding the indecent assault upon Corporal Walsh; (e) that the military judge erred

12    when he permitted the Government to bolster the testimony of Christy Stilson by Sgt.

13    Kiefer with an excited utterance exception to Kiefer's hearsay testimony; (f) that the

14    military judge erred by failing to grant a mistrial when the Government proceeded on

15    charges about which it knew it could present no evidence; and (g) a post-trial processing

16    delay. **Exhibit 1.**

17    44.  On November 21, 2006, the Court of Criminal Appeals denied

18    Petitioner's seven assignments of error, holding the trial court's findings and

19    sentence to be correct in law and fact. **Exhibit 1.**

20    45.  On November 22, 2006, Petitioner appealed to the U.S. Court of

21    Appeals for the Armed Forces for a grant of review of the Court of Criminal Appeals'

22    decision, urging that he was entitled to a new trial because two key witnesses, Corporals

23    Zimmer and Burgie, perjured themselves during his trial. **Exhibit 2.**

1    46. Further, on November 27, 2006, Petitioner also filed with the Court of Appeals

2    for the Armed Forces a supplement to his said petition for a new trial with a petition for

3    grant of review, with Petitioner urging that: 1) the military judge erred when he denied a

4    Government motion, intended to protect Petitioner's constitutional right to counsel, to

5    replace trial defense counsel who, due to other caseload commitments, was unable to

6    provide effective and timely representation to Petitioner; 2) trial counsel committed

7    prosecutorial misconduct: a) by comparing Petitioner to movie characters who sexually

8    preyed on children, b) by asking Petitioner if his wife was suspicious of him when there

9    was no good-faith basis for asking that question, c) by arguing that "nobody on the planet

10   believed [Petitioner's] story" and by comparing Petitioner's defense about how he

11   entered Stilson's home with aliens who used a "tractor beam," d) by asking members to

12   put themselves in Petitioner's shoes when he was first questioned by military police at his

13   home, and e) by asking Petitioner's wife "why five women would lie about your husband

14   sexually assaulting them" when Petitioner was only charged with three specifications of

15   indecent assault; 3) the military judge erred when he declined to adhere to the liberal

16   grant mandate and denied Petitioner's challenge for cause to Gunnery Sergeant Duhe; 4)

17   the military judge erred when he permitted Sergeant Kiefer's hearsay testimony to bolster

18   the testimony of Mrs. Stilson on the basis of the excited utterance exception; and 5) the

19   military judge erred when he declined to grant a mistrial where the Government

20   proceeded to trial on charges that the Government knew at the outset of trial it would not

21   support with any evidence. **Exhibit 3.**

22        47. It is undisputed that, trial defense counsel filed a motion for continuance on

23   August 17, 2004, five days prior to commencement of Petitioner's trial on August 23,

1    citing as the basis for his request his extremely busy trial schedule, heavy caseload of 36

2    cases, and collateral duty assignments.

3        48.  Counsel informed the Court that he had not had time to talk to Petitioner and

4    prepare for trial, nor had he filed any motions in advance of trial.

5        49.  When the military judge asked counsel how a continuance was going to help

6    him to adequately represent Petitioner if the caseload were to remain the same, counsel

7    replied that it would not, and that he was instead trying to have a new defense counsel

8    assigned to the case.

9        50.  The Government then moved to have to have the military judge order a new

10    defense counsel assigned to the case to protect Petitioner's rights.

11        51.  The military judge denied the Government's motion.  He did, however, grant

12    counsel's request for a continuance.

13        52.  When, on August 26, 2004, a new military judge convened another pre-trial

14    session and again addressed the Government's request that a new defense counsel be

15    assigned, he also denied the request.

16        53.  Subsequently, when the military judge asked defense counsel if he had sought

17    testimonial immunity for Corporal Burgie, the only witness to Petitioner's alleged assault

18    upon Corporal Zimmer, counsel confessed that he had not and revealed that he also did

19    not understand the proper procedure for making that request.

20        54.  On September 22, 2004, twelve days prior to Petitioner's second trial date,

21    defense counsel again requested a continuance, this time to November 1, 2004, with the

22    military judge granting the request, but then warning counsel not to request any further

1    continuances and stating that counsel was not providing Petitioner with competent

2    representation.

3         55. In the weeks leading up to trial, defense counsel finally produced two motions,

4    both of which were determined by the judge to be wholly inadequate on their face.

5    Meanwhile, counsel never obtained testimonial immunity for Corporal Burgie, insisting

6    instead that Burgie simply be produced for trial – with the predictable result being that at

7    trial Burgie invoked his right to remain silent.

8         56. The panel sentenced Petitioner to 15 years, which prompted trial counsel to

9    request a lighter sentence, stating in his letter for clemency, as follows: "The reason for

10   the difference between the adjudged 15 year sentence and my recommendation of 7 years

11   lay in SSgt. Hernandez's defense lawyers being less experienced than me and, with my

12   preparation and some luck in random rulings and witnesses' choice of words, I was able

13   to present SSgt. Hernandez in his most foul light and make almost irrelevant his defense

14   counsel's counter arguments.  In short, the jury considered a one-sided argument."

15        57. Further, on November 1, 2004, trial counsel committed prosecutorial

16   misconduct by comparing Petitioner to a movie character that preys on high school

17   children and then describing details of that movie scene.  It is held, however, that when

18   trial counsel argues facts not in evidence, or discusses facts of another case he violates

19   well-settled principles of law.  See United States v. Rodriguez, 60 M.J. 87, 88 (CAAF

20   2004).

21        58. Subsequently, trial counsel, with no good faith basis, asked Petitioner on cross-

22   examination why his wife was "suspicious" of him.  This damaging action resulted in

23   members then asking Petitioner "if [his] wife was suspicious of [him] being alone with

1    Mrs. Stilson," why his wife was not "present in the courtroom," "whether she was

2    planning to testify on [Petitioner's] behalf," and "if [he] was still married to her?"

3        59.  Further, during closing arguments, said counsel stated that "nobody on the

4    planet" believed [Petitioner's] story in regard to how he entered Mrs. Stilson's home,

5    likening Petitioner's version to "aliens beaming down a tractor beam."

6        60.  Again, it is settled that disparaging comments directed at a Defendant are

7    improper, United States v. Fletcher, 62 M.J. 175, 182 (CAAF 2005), and that calling the

8    accused a liar is a dangerous proposition that should be avoided.  Id.

9        61.  In addition, counsel asking the panel to place themselves "in the place of

10   [Petitioner] when he was first questioned by military police at his home," is in violation

11   of the well-settled notion that a jury must not be asked to place itself in the position of the

12   parties at trial.  Dole v. USA Waste Serv., Inc., 100 F.3d 1384, 1388 (8th Cir. 1996);

13   Spray-Rite Serv. Corp. v. Monsanto Corp., 684 F.2d 1226, 1246 (7th Cir. 1982).

14       62.  Moreover, regarding prosecutorial misconduct arising from arguing facts not

15   in evidence, trial counsel, during cross-examination of Petitioner's wife, repeatedly asked

16   "Why, that you're aware of, would five women lie about your husband sexually

17   assaulting them?" despite the fact that trial counsel was aware that Petitioner was only

18   accused of indecently assaulting three women (due to Copeland's admission that

19   Petitioner never touched her and Zimmer completely fabricating her story).

20       63.  Further, during voir dire Major Curtin, a panel member, stated that he wrote

21   the fitness report for another panel member, Gunnery Sergeant Duhe, that they had

22   previously served together at the company level, and that when Major Curtin was

23   reassigned, he had Duhe moved to the new battalion to work for him at his new post.

1       64. Although Major Curtin stated that Gunnery Sergeant Duhe would not be

2  influenced by Curtin's presence on the panel, defense counsel still challenged Duhe for

3  cause because his presence on the panel would raise questions as to the "appearance of

4  legality, fairness, and impartiality" of the panel. The military judge denied this

5  challenge.

6       65. In addition, during his opening statement, trial counsel discussed how

7  Petitioner allegedly maltreated, sexually harassed, and fraternized with then Corporal

8  Mary Ku as part of his alleged "escalating pattern" of sexual misconduct.

9       66. However, by the time that Petitioner's trial began in November, 2004,

10  Corporal Ku had left the Marine Corps, moved to Ohio, and was in her third trimester of

11  pregnancy, all facts of which trial counsel was very well aware.

12       67. The Government, however, proceeded with its case, allowing the charges

13  involving Corporal Ku to remain before the panel members.

14       68. Several days later, the Government rested its case without having produced

15  Corporal Ku or any other evidence to support those charges.

16       69. Defense counsel moved for a finding of not guilty to the charges, which was

17  granted by the military judge.

18       70. Defense counsel also moved for a mistrial because the Government had

19  proceeded on material and fundamental charges that it knew that it could not prove, made

20  no effort to prove, and, in fact, had no intention of trying to prove.

21       71. The military judge, however, denied this motion.

1       72. On June 28, 2007 the Court of Appeals for the Armed Forces summarily

2    denied in their entirety Petitioner's request for review and for a new trial. **Exhibit 4.**

3    Petitioner now presents this petition for habeas corpus.

4                         **IV. Scope Of Review**

5       73. In habeas reviews, federal civil courts must review claims of denial of due

6    process rights to which military courts have not given full and fair consideration. Burns,

7    346 U.S. at 144.

8       74. Four questions are examined to determine whether a federal habeas

9    court should decide in favor of a constitutional challenge to a court-martial conviction:

10    (1) whether the asserted error is of substantial constitutional dimension; (2) whether the

11    issue is one of law rather than of disputed fact already determined by the military

12    tribunals; (3) whether military considerations warrant different treatment of the

13    constitutional claim(s); and (4) whether the military courts gave adequate consideration

14    to the issues involved and applied proper legal standards. Calley v. Callaway, 519 F.2d

15    184, 203 (5th Cir. 1975) (en banc), *cert. den*, 425 U.S. 911 (1976). See Monk v. Zelez,

16    901 F.2d 885, 888 (10th Cir. 1990); Mendrano v. Smith, 797 F.2d 1538, 1542, n.6 (10th

17    Cir. 1986).

18       75. As stated by the Burns Court: "[T]he constitutional guarantee of due process is

19    meaningful enough, and sufficiently adaptable, to protect soldiers – as well as civilians –

20    from the crude injustices of a trial so conducted that it becomes bent on fixing guilt by

21    dispensing with rudimentary fairness rather than finding truth through adherence to those

22    basic guarantees which have long been recognized and honored by the military courts as

23    well as the civilian courts." Id., at 142-43.

1      76. As such, <u>Burns</u> holds that where military courts have "manifestly

2   refused to consider [a habeas petitioner's] claims," federal district courts may

3   review such claims *de novo.* <u>Id.</u>, at 142.

4      77. The standard of review for military habeas cases is extremely narrow. <u>Monk</u>,

5   901 F.2d at 888. Therefore, the U.S. Supreme Court may not review by writ of certiorari

6   under any section any action by the Court of Appeals for the Armed Forces in refusing to

7   grant a petition for review. 10 U.S.C. § 867.

8                          **V. Claim (Violation of Due Process)**

9   **A. The Refusal of the Court of Appeals for the Armed Forces to Conduct a De Novo**
10  **Review of the Factual and Legal Findings Was a Violation of Petitioner's Right to**
11  **Due Process that Constituted a Substantial Error Sufficient To Warrant an**
12  **Issuance of a Writ of Habeas Corpus.**

13     78. *De novo* judgments by the Court of Criminal Appeals on issues of

14  constitutional violations are within the scope of the Uniform Code of Military Justice;

15  likewise, the Court of Appeals for the Armed Forces power of review is equally as broad

16  due to the fact that the question of a violation of due process is constitutional in nature

17  and, like other constitutional questions, calls first for fact-finding and then legal

18  conclusions, which as a matter of law are subject to full review by appellate courts. <u>See</u>

19  <u>United States v. Abell</u>, 23 M.J. 99, 102 (CMA 1986), *cert. den*, 483 U.S. 1020 (1987);

20  <u>United States v. Burris</u>, 21 M.J. 140, 143-44 (CMA 1985).

21     79. It is settled that "[t]he Court of Appeals for the Armed Forces was expressly

22  created 'to enforce procedural safeguards which Congress determined to guarantee to

23  those in the nation's armed forces.'" <u>United States ex. rel</u>. <u>Chaparro v. Resor</u>, 298 F.

24  Supp. 1164, 1167 (DC S.C. 1969).

1      80. "The purpose of review by military authorities of a general court-martial trial

2    is to assure that procedural due process has been observed, that the evidence supports the

3    verdict and the judgment of the court, and that fundamental rights have been observed;

4    this purpose is substantially the same as review of conviction in criminal trials in civil

5    courts ***except that review is mandatory***." Sweet v. Taylor, 178 F. Supp. 456, 459 (DC

6    Kan. 1959).

7    [Emphasis added.]

8      81. As stated, Petitioner, in his appeal to the Court of Criminal Appeals,

9    cited the following seven separate and distinct procedural due process violations

10   committed by the trial court: 1) that the military judge erred in denying a Government

11   request to replace the trial defense counsel due to his inability to provide timely

12   representation; 2) the said prosecutorial misconduct; 3) that the military judge erred in

13   denying Petitioner's challenge for cause against service by the enlisted representative on

14   the trial panel; 4) the legal and factual insufficiency as to the finding of guilty in regard to

15   the indecent assault upon Corporal Walsh; 5) that the military judge erred when he

16   permitted the Government to bolster the testimony of Christy Stilson by Sgt. Kiefer with

17   an excited utterance exception to Kiefer's hearsay testimony; 6) that the military judge

18   erred by failing to grant a mistrial when the Government proceeded on charges about

19   which it knew it could present no evidence; and 7) post-trial processing delay.

20      82. It is incontrovertible that, in its decision pursuant to Petitioner's said appeal,

21   dated November 21, 2006, the Court addressed only three of these asserted violations, as

22   numbered in the preceding paragraph: 1) that the military judge erred in denying a

23   Government request to replace the trial defense counsel due to his inability to provide

1    timely representation; 4) the legal and factual insufficiency as to the finding of guilty in

2    regard to the indecent assault upon Corporal Walsh; and 7) post-trial processing delays.

3        83.  As such, the Court refused to address (and pointedly gave no reasons as to why

4    it refused to even discuss) Petitioner's remaining cites of the trial court's due process

5    violations regarding the following (as numbered in paragraph 81): 2) the said deliberate

6    prosecutorial misconduct; 3) that the military judge erred in denying Petitioner's

7    challenge for cause against service by the enlisted representative on the trial panel; 5) that

8    the military judge erred when he permitted the Government to bolster the testimony of

9    Christy Stilson by Sgt. Kiefer with an excited utterance exception to Kiefer's hearsay

10   testimony; and 6) that the military judge erred by failing to grant a mistrial when the

11   Government proceeded on charges about which it knew it could present no evidence.

12       84.  Therefore, in view of the refusal by the Court of Criminal Appeals to give any

13   indication in its sparse and incomplete opinion as to how Petitioner's procedural due

14   process rights were observed by the trial court regarding the due process violations

15   ignored in its opinion, and the summary refusal by the Court of Appeals for the Armed

16   Forces to review any of the procedural violations, the blatant failure of these appellate

17   courts to assure that Petitioner was properly accorded full and adequate review now

18   mandates issuance of a writ of habeas corpus.

19   **B. All Unreviewed Due Process Issues Were Of Law, Rather Than**
20   **   Disputed and Already Decided Fact.**

21       85.  The first unreviewed due process violation, citing prosecutorial misconduct

22   (*i.e.,* comparing Petitioner to movie villains, asking whether his wife is "suspicious" of

23   him, and likening the credibility of Petitioner's story denying Stilson's allegations to

24   "alien tractor beams"), is relevant because it is highly improper for trial counsel to argue

17

1    facts not in evidence as done when counsel asked Petitioner's wife "why five women

2    would accuse [her] husband of sexual assault" when counsel knew Petitioner faced only

3    three indecent assault charges], see United States v. Rodriguez, 60 M.J. 87, 88 (CAAF

4    2004), and when counsel directed disparaging comments at the Defendant, see Fletcher,

5    62 M.J. at 183, and when counsel called the accused a liar. Id.

6        86.  Further, it is also improper to ask a jury to place itself in the position of the

7    parties at trial, as done when trial counsel asked the panel to place themselves "in the

8    place of [Petitioner] when he was first questioned by military police at his home." Dole,

9    100 F.3d 1384 at 1388; Spray-Rite Serv. Corp., 684 F.2d at 1246.

10       87.  The second unreviewed due process violation cites the military judge's error in

11   denying Petitioner's *voir dire* challenge for cause against service by the enlisted man,

12   Gunnery Sergeant Duhe, on the panel with his close, long-time, and immediate superior,

13   Major Curtin, even though defense counsel pointed out that Duhe's presence on the panel

14   raised substantial doubt as to the panel's appearance of "legality, fairness, and

15   impartiality." United States v. Jefferson, 44 M.J. 312, 319 (CAAF 1996); RCM

16   912(f)(1)(N): "[a] member shall be excused for cause if it appears to be 'in the interest of

17   having the court-martial free from substantial doubt as to legality, fairness, and

18   impartiality.'"

19       88.  The discussion to subsection (N) states as follows in pertinent part: "examples

20   of matters which may be grounds for challenge under subsection (N) are that the member:

21   '...is closely related to the accused, a counsel, or a witness in the case,...[or] has a

22   decidedly friendly or hostile attitude toward a party.'" RCM 912(f)(1)(N).

23       89.  The failure of both the Court of Criminal Appeals and the Court

1    of Appeals for the Armed Forces to review this clear abuse of discretion by the military

2    judge in denying the defense's challenge for cause to Sergeant Duhe's service on that

3    panel constitutes a plain violation of Petitioner's right to adequate appellate review of his

4    right to procedural due process. Jefferson, 44 M.J. at 317.

5            90. The third unreviewed due process violation, the military judge's error in

6    allowing Sgt. Kiefer to bolster Christy Stilson' testimony with an excited utterance

7    exception to Kiefer's hearsay testimony, is in violation of the Military Rules of Evidence.

8    The Mil. R. Evid. 803(2), Manual for Courts-Martial, defines an excited utterance as a

9    statement relating to a startling event or condition made while the declarant was under the

10    stress of excitement caused by the event or condition.

11            91. The court has interpreted this to mean that "it must appear that the declarant's

12    condition at the time was such that the statement was spontaneous or impulsive rather

13    than the product of reflection or deliberation....since the key to the rule is lack of

14    capacity to fabricate, not lack of time, the lapse of time between the alleged event and the

15    statement is not outcome-determinative. The crucial point is that the court must be able

16    to find that the declarant's state of mind at the time [s]he made the declaration ruled out

17    the possibility of conscious thought." United States v. Keatts, 20 M.J. 960, 963 (CMR

18    1985).

19            92. The admission of an excited utterance will be overturned only upon a showing

20    of a clear abuse of discretion by the judge. Id., at 961.

21            93. Therefore, in the case at bar, in view of the fact that Mrs. Stilson: 1)

22    entirely neglected to call 911, and, instead, then drove across base to report the alleged

23    event to her husband, and 2) was, thereafter, composed when she related the alleged

19

1   molestation only an hour later indicates that, apart from the factual issue of whether the

2   event occurred or not, there is no way, as a matter of law, that the trial court could have

3   reasonably ruled out the "possibility of conscious thought" on the part of Mrs. Stilson

4   before she spoke to Kiefer. Id.

5       94. Thus, as a matter of law, it was an abuse of discretion for the military judge to

6   admit Kiefer's testimony based upon the excited utterance exception, and a clear

7   violation of law to not subject this lack of due process to appellate review.

8       95. Finally, regarding the fourth unreviewed due process violation (asserting that

9   the military judge erred by failing to grant a mistrial when the Government proceeded on

10   charges in regard to Mary Ku about which it knew it could present no evidence), it is

11   highly improper to introduce and maintain as "facts" until the end of trial highly

12   prejudicial allegations which counsel knows will never be supported by even one shred of

13   evidentiary support. United States v. Rodriguez, 60 M.J. 87, 88-89 (CAAF 2004).

14       96. Therefore, as it is settled that "no party has a right to have his case decided by

15   a jury which may be tainted by bias," Arizona v. Washington, 434 U.S. 497, 516 (1978),

16   the failure of the appellate courts to review this plain violation of Petitioner's 5th

17   Amendment right to due process and his 6th Amendment right to face and cross-examine

18   his accuser constitutes reversible error.

19   **C. There Are No Military Considerations Which Warrant Different Treatment of**
20   **Petitioner's Constitutional Right to Procedural Due Process.**

21       97. The issue of Petitioner's fundamental constitutional right to procedural

22   due process is subject to *de novo* review by this Court, as a matter of law,

1    "because it is both 'substantial and largely free of factual questions.'" <u>Monk v. Zelez</u>,

2    901 F.2d 885, 888 (10th Cir. 1990) (quoting <u>Mendrano v. Smith</u>, 797 F.2d 1538, 1542,

3    n.6 (10th Cir. 1986)).

4    **D. Neither the Court of Criminal Appeals nor the Court of Appeals for the Armed**
5    **Forces Ever Gave Adequate Consideration to the Issues Involved or Applied the**
6    **Proper Legal Standards.**

7        98.  No appellate court ever reviewed or addressed the trial court's violations of

8    Petitioner's due process rights in regards to: 1) deliberate and highly prejudicial

9    prosecutorial misconduct; 2) the military judge's commission of reversible error, as a

10   matter of law, in denying Petitioner's challenge for cause against service by the enlisted

11   representative on the trial panel; 3) the military judge's commission of reversible error, as

12   a matter of law, in permitting the Government to bolster the testimony of Christy Stilson

13   by Sgt. Kiefer with an excited utterance exception to Kiefer's hearsay testimony; and 4)

14   the military judge's commission of reversible error, as a matter of law, in failing to grant

15   a mistrial when the Government proceeded on charges about which it knew it could and

16   would present no evidence.

17       99.  The absolute failure of both the Court of Criminal Appeals and the Court of

18   Appeals for the Armed Forces to review the aforesaid clear violations of Petitioner's

19   constitutional right to procedural due process by the trial court constitutes reversible

20   error.

21       100.  On these grounds, and because Respondent continues to unlawfully detain

22   Petitioner, this Court must issue a writ of habeas corpus directing Petitioner's immediate

23   and permanent release from the custody of Respondent.

24                           **Prayer For Relief**

1      WHEREFORE, Petitioner respectfully prays that this Honorable Court:

2  1) Immediately reverse, overturn, and vacate, in its entirety, the general court-martial

3  conviction and sentence imposed by the convening authority and affirmed by the Court of

4  Criminal Appeals and the Court of Appeals for the Armed Forces which ultimately found

5  Petitioner guilty of two specifications of maltreatment of a subordinate, burglary, two

6  specifications of indecent assault, and violation of a lawful general order, pursuant to Art.

7  92, 93, 129 and 134, UCMJ, 10 U.S.C. sections 892, 892, 929, and 934, wherein a

8  sentence of confinement for six years, reduction to pay grade E-1, and a dishonorable

9  discharge was imposed.

10  2) Order Respondent to immediately release Petitioner from said unlawful detention and

11  custody;

12  3) Order Respondent to show cause within five (5) days why such conviction and

13  sentence should not be permanently vacated.

14  4) Order Respondent to immediately and forthwith restore Petitioner to pay grade E-6,

15  and to award to him forthwith all other such back pay, rank, benefits, entitlements, and

16  privileges as have been unlawfully denied by Respondent as a result of said prosecution

17  and conviction.

18  5) Order Respondent to immediately, completely, and expeditiously make all such

19  changes to all of Petitioner's official and unofficial records in Respondent's care,

20  custody, and/or control in order to fully effectuate, enable, and carry out the Order of this

21  Court.

22  6) Award Petitioner costs and attorney's fees.

23  7) Grant all such other and further relief as this Court deems just and proper.

Respectfully submitted,

David P. Sheldon
*Attorney for Petitioner*

# IN THE U.S. NAVY-MARINE CORPS COURT OF CRIMINAL APPEALS
## WASHINGTON NAVY YARD
## WASHINGTON, D.C.

### BEFORE

**J.W. ROLPH**  **E.E. GEISER**  **F.D. MITCHELL**

### UNITED STATES

### v.

### DAVID A. HERNANDEZ-ALVERADO
### Staff Sergeant (E-6), U. S. Marine Corps

NMCCA 200600037                      Decided 21 November 2006

Sentence adjudged 05 November 2004.  Military Judge: D.M. Jones.
Review pursuant to Article 66(c), UCMJ, of General Court-Martial
convened by Commander, 1st Force Service Support Group, MARFORPAC,
Camp Pendleton, CA.

LT BRIAN L. MIZER, JAGC, USNR, Appellate Defense Counsel
Capt ROGER E. MATTIOLI, USMC, Appellate Government Counsel

AS AN UNPUBLISHED DECISION, THIS OPINION DOES NOT SERVE AS PRECEDENT.

GEISER, Senior Judge:

   A general court-martial with enlisted representation
convicted the appellant, contrary to his pleas, of violating a
lawful general order, two specifications of maltreatment of a
subordinate, burglary, and three specifications of indecent
assault, in violation of Articles 92, 93, 929, and 934, Uniform
Code of Military Justice, 10 U.S.C. §§ 892, 893, 929, and 934.
The appellant was sentenced to a dishonorable discharge,
confinement for fifteen years, and reduction to pay grade E-1.
The convening authority disapproved the finding of guilty to one
specification of indecent assault and approved only so much of
the sentence as extended to a dishonorable discharge, confinement
for six years, and reduction to pay grade E-1.

1

The appellant raises seven assignments of error.[1]  We have examined the record of trial, the assignments of error, and the Government's response.  We address the appellant's contention that the military judge erred by denying a Government request that the court order the appointment of a new trial defense counsel; his contention that the evidence was legally and factually insufficient to support a finding of guilty to Specification 2 of Charge IV; and his assertion of post-trial processing delay.  We have considered the appellant's remaining assignments of error, and find they are without merit.  We conclude that the findings and sentence are correct in law and fact and that no error was committed that was materially prejudicial to the substantial rights of the appellant.  Arts. 59(a) and 66(c), UCMJ.

## Appointment of a New Trial Defense Counsel

The appellant asserts that the military judge erred when he denied a Government request that a new trial defense counsel be appointed to represent the appellant due to the detailed trial defense counsel's heavy workload.  We find this assignment of error to be wholly frivolous.  We observe that the argument advanced by the appellate defense counsel is based in part on a skewed reading of the record of trial and in part on wholly inaccurate factual citations to the record.  We further note that, while counsel's exposition of the appellant's version of events throughout the Appellant's Brief and Assignment of Errors of 25 May 2006 is substantially accurate, the lack of even passing reference to the existence of other contradictory testimony creates the potential to mislead this court.

By way of example, we note that the appellant's brief, at page 15, asserts in connection with this assignment of error that the military judge stated that "he was powerless to enforce Appellant's statutory and Constitutional rights."  What the military judge actually said in connection with a defense motion for a continuance and a Government request that the military judge assign new counsel, was that "there was no authority for the military judge to order counsel to be detailed to the accused."  Record at 24.  The military judge went on to state that the Government had the power to assign additional counsel and need not come to the military judge to accomplish this action.

---

[1] I - Military judge erred by denying a Government request to replace the trial defense counsel due to his inability to provide timely representation; II - prosecutorial misconduct; III - military judge erred by denying the appellant's challenge for cause against Gunnery Sergeant D; IV - legal and factual sufficiency of finding of guilty to Specification 2 of Charge IV; V - military judge erred when he permitted the Government to bolster the testimony of CLS with an excited utterance; VI - military judge erred by failing to grant a mistrial when the Government proceeded on charges about which it knew it would present no evidence; and VII - post-trial processing delay.  In addition, the appellant has a pending motion for a new trial which is denied.

In fact, the Government shortly thereafter did assign an assistant trial defense counsel to alleviate the trial defense counsel's workload issues. Record at 29. The military judge granted the defense request for a continuance to allow the new attorney to get up to speed and to have input into any potential defense motions. Record at 30-31.

We share the military judge's frustration that the trial defense counsel, notwithstanding his busy schedule, had failed over several months to request assistance from his chain of command or to have the appellant submit an individual military counsel request. The Government could also have been far more proactive in getting additional assets assigned once they became aware of the issue rather than simply dumping everything in the lap of the military judge to sort out. We commend the military judge for effectively steering counsel to an appropriate solution which ensured the appellant received adequate counsel and sufficient time to prepare for trial. We decline to provide relief.

### Legal and Factual Sufficiency

The test for legal sufficiency is whether, considering the evidence in the light most favorable to the Government, any rational trier of fact could have found the elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979); *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987); *United States v. Reed*, 51 M.J. 559, 561-62 (N.M.Crim.Ct.App. 1999), *aff'd*, 54 M.J. 37 (C.A.A.F. 2000); *see also* Art. 66(c), UCMJ. The test for factual sufficiency is whether, after weighing all the evidence in the record of trial and recognizing that we did not see or hear the witnesses, this court is convinced of the appellant's guilt beyond a reasonable doubt. *Turner*, 25 M.J. at 325; *see also* Art. 66(c), UCMJ.

There are three elements to the offense of indecent assault: (1) that the appellant assaulted a certain person not his spouse in a certain manner; (2) that the acts were done with the intent to gratify the lust or sexual desires of the appellant; and (3) that under the circumstances, the conduct of the appellant was to the prejudice of good order and discipline in the armed forces or was of a nature to bring discredit upon the armed forces. MANUAL FOR COURTS-MARTIAL, UNITED STATES (2002 ed.), Part IV, ¶ 63b. On appeal, the appellant does not seriously contest that there was evidence that he touched the victim's buttocks or that such a touching, if done to gratify his lust or sexual desires, would have been prejudicial to good order and discipline and service discrediting. At issue is whether there was sufficient direct or circumstantial evidence to prove beyond a reasonable doubt that, when touching the victim, the appellant had an intent to gratify his lust or sexual desires.

This court is convinced that a rational fact finder could have found the appellant guilty of this offense. The victim testified that he touched her buttocks and that when she turned and gave him a dirty look, he just smiled. She also testified to the appellant's words and actions throughout the day, including that he openly discussed the fact that he and his wife were together "only for the sake of the children," that he inquired into the circumstances of her marriage, that he specifically inquired whether her husband "satisfied her," that he openly discussed how long it had been since he'd had sex, and that he was repeatedly asking her for a kiss. Record at 491-93. The witness also testified that during a drive to inspect the 22 area, the appellant began rubbing her shoulders and playing with her hair while commenting on how nice her hair was. Record at 497. After weighing all the evidence in the record of trial and recognizing that we did not see or hear the witnesses, this court is convinced of the appellant's guilt to Specification 2 of Charge II beyond a reasonable doubt. *Turner*, 25 M.J. at 325.

### Post-Trial Delay

The appellant also asserts that a delay of "more than one year and six months" from the date sentence was announced to the date the case was docketed with this court is unreasonable. We consider four factors in determining if post-trial delay violates an appellant's due process rights: (1) length of the delay; (2) reasons for the delay; (3) the appellant's assertion of the right to a timely appeal; and (4) prejudice to the appellant. *United States v. Jones*, 61 M.J. 80, 83 (C.A.A.F. 2005)(citing *Toohey v. United States*, 60 M.J. 100, 102 (C.A.A.F. 2004)). If the length of the delay is not unreasonable, further inquiry is not necessary. If we conclude that the length of the delay is "facially unreasonable," however, we must balance the length of the delay against the other three factors. *Id.*

In the instant case, there was a delay of about 480 days from the date of sentencing to the date the case was docketed with this court. While much of the delay was reasonable, a delay of 147 days between the convening authority's action and docketing with this court was not. We find this period of unexplained delay to be facially unreasonable triggering a due process review. *See United States v. Moreno*, 63 M.J. 129 (C.A.A.F 2006); *United States v. Brown*, 62 M.J. 602, 605 (N.M.Ct.Crim.App 2005)(en banc).

We balanced the length of delay in this case in the context of the three remaining *Jones* factors. Regarding the second factor, reasons for the delay, the Government offers no explanation why it took 147 days to docket this case. We note that some explanation, even an acknowledgement of simple negligence on the part of the convening authority, is better than no explanation whatsoever which implies a more callous disregard

4

for the appellant's rights and this court's decisions. With respect to the third factor, we find that the appellant first asserted his right to timely post-trial review in a 20 January 2006 petition for an extraordinary writ filed with this court. We note that the case was docketed 39 days later. Finally, regarding the fourth factor, the appellant makes no assertion of and this court finds no evidence of, material prejudice to a substantial right resulting from post-trial delay in this case. The appellant asks this court to presume prejudice, however, based on the passage of time. Our superior court has clearly stated that the mere passage of time, standing alone, does not constitute prejudice. *Moreno*, 63 M.J. at 142. Considering all four factors, we conclude that there has been no due process violation due to post-trial delay.

We next consider whether this is an appropriate case to exercise our authority to grant relief under Article 66(c), UCMJ, in the absence of a due process violation. Having considered the post-trial delay in light of our superior court's guidance in *Toohey* and *United States v. Tardif*, 57 M.J. 219, 224 (C.A.A.F. 2002), and considering the factors we explained in *Brown*, we decline to provide relief.

### Conclusion

The approved findings and sentence are affirmed.

Chief Judge ROLPH and Judge MITCHELL concur.

For the Court

R.H. TROIDL
Clerk of Court

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ARMED FORCES

| | |
|---|---|
| In Re, | PETITION FOR A NEW TRIAL |
| David A. HERNANDEZ-ALVERADO<br>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<br>Staff Sergeant (E-6)<br>U.S. Marine Corps, | USCA Dkt. No. 07-_____/MC<br><br>Crim.App. No. 200600037 |
| Petitioner, | |
| v. | |
| United States, | |
| Respondent. | |

**TO THE HONORABLE, THE JUDGES OF THE UNITED STATES
COURT OF APPEALS FOR THE ARMED FORCES**

BRIAN L. MIZER
LT, JAGC, USN
Bar No. 33030
Appellate Defense Counsel
Navy-Marine Corps Appellate Review
Activity
716 Sicard Street, SE, Suite 1000
Washington Navy Yard, D.C. 20374
(202) 685-7290

FILE COPY

2

## QUESTIONS PRESENTED

I.    IS PETITIONER ENTITLED TO A NEW TRIAL WHERE THE
      GOVERNMENT HAS CONCEDED THAT TWO WITNESSES PERJURED
      THEMSELVES DURING HIS TRIAL?

## TABLE OF CONTENTS

Page

Questions Presented . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

Preamble . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

History of the Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Relief Sought . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Issue Presented . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

      I.    IS PETITIONER ENTITLED TO A NEW TRIAL WHERE THE
           GOVERNMENT HAS CONCEDED THAT TWO WITNESSES
           PERJURED THEMSELVES DURING HIS TRIAL? . . . . . . . . . . . . . . . 2

Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Reasons why Petition Should be Granted . . . . . . . . . . . . . . . . . . . . . . . . . 7

Certificate of Service . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

**TABLE OF AUTHORITIES**

Page

CASES OF THE SUPREME COURT OF THE UNITED STATES

    *Giles v. Maryland*, 386 U.S. 66 (1967) .................... 12

UNITED STATES COURT OF APPEALS FOR THE ARMED FORCES AND
COURT OF MILITARY APPEALS CASES

    *United States v. Buber*, 2006 C.A.A.F. LEXIS 308
      (C.A.A.F. 2006) ....................................... 10

    *United States v. Doss*, 57 M.J. 182 (C.A.A.F.
      2002) ................................................ 9

    *United States v. Moffeit*, 2006 C.A.A.F. LEXIS 419
      (C.A.A.F. 2006) ...................................... 9

    *United States v. Sales*, 22 M.J. 305 (C.M.A. 1986) ....... 1,9

## Preamble

Staff Sergeant David A. Hernandez-Alverado, U.S. Marine Corps, respectfully requests this Court grant Petitioner's request for a new trial.

## I

## History of the Case

On November 5, 2004, Petitioner was convicted, contrary to his pleas, by a general court-martial, composed of members with enlisted representation, of one specification of violating a lawful order, two specifications of maltreatment, one specification of burglary, and three specifications of indecent assault in violation of articles 92, 93, 129, and 134 Uniform Code of Military Justice, 10 U.S.C. §§ 892, 893, 929, and 934 (2006).

Petitioner was sentenced to fifteen years confinement, reduction in rate to E-1, and a dishonorable discharge. Because one of Petitioner's alleged victims, Lance Corporal April Zimmer, perjured herself at Petitioner's court-martial, the convening authority disapproved and dismissed the findings with regard to Petitioner's alleged indecent assault of Lance Corporal Zimmer. Citing *United States v. Sales*,[1] the convening authority approved only six years confinement, reduction in rate to E-1, and a dishonorable discharge.

On May 10, 2006, Appellant petitioned the Judge Advocate General of the Navy for a new trial in his case.

---

[1] 22 M.J. 305 (C.M.A. 1986).

The Judge Advocate General forwarded the petition to the lower court and, on November 21, 2006, the lower court denied Petitioner's petition in a footnote to its decision on Petitioner's direct appeal.[2]

## II

## Relief Sought

Staff Sergeant Hernandez-Alverado seeks a new trial.

## III

## Issue Presented

> IS PETITIONER ENTITLED TO A NEW TRIAL
> WHERE THE GOVERNMENT HAS CONCEDED THAT
> TWO WITNESSES PERJURED THEMSELVES DURING
> HIS TRIAL?

## IV

## Statement of Facts

In the fall of 2003, Lance Corporal Tamarijn A. Walsh was in a meeting with her husband, also a Marine, and her husband's career counselor.[3] The career planner asked her if she had any reservations about her husband reenlisting in the Marine Corps.[4] She responded, "I have seen a lots of people get away with lots of things."[5] She went on to tell the counsel, and later her chain of command, that months earlier, on July 14, 2003, she had been sexually harassed while she was on duty with Petitioner.[6] And, while she passed Petitioner at the duty desk, his hand brushed against

---

[2] *United States v. Hernandez-Alverado*, No. 200600037 (N-M. Ct. Crim. App. 2006).
[3] R. at 501.
[4] R. at 501.
[5] *Id.*
[6] R. at 491, 493, 495, 502.

2

her buttocks.[7]  Sergeant Aceves, also on duty that night, did not see Petitioner touch Lance Corporal Walsh's buttocks or anything inappropriate take place.[8]

Petitioner's command launched an investigation and appointed First Lieutenant Denise D. Vasel to lead it.[9]  The battalion Sergeant Major ordered all females to report to First Lieutenant Vasel.[10]  Corporal Zimmer described the meeting.  "In December, the battalion had a meeting with a bunch of females.  And a female lieutenant asked us if he, staff sergeant, did anything to us.  I told her he didn't."[11]

But others said he had.  Lance Corporal S. L. Castaneda said that Petitioner had sexually harassed her while the unit was deployed to Kuwait eight months earlier.[12]  Corporal Tiffany A. Copeland said that, two years earlier, Petitioner had told her to call him by his first name and had invited her to a bar.[13]

After the investigation broke, Corporal William P. Burgie testified that, on several occasions, he saw several of the complainants out by the smoke pit discussing the ongoing investigation of Petitioner.[14]  One of the female Marines told Burgie that their conversation was none "of my

---

[7] R. at 495, 510.
[8] R. at 540, 542.
[9] Command Investigation  Into Allegations of Sexual Harassment in the case of Tamarijn A. Walsh dated 3 Nov. 2003.
[10] R. at 579.
[11] R. at 454.
[12] R. at 267.
[13] R. at 563-64, 582.
[14] R. at 646.

fucking business and to go somewhere else and smoke."[15]
Lance Corporal Walsh testified that, on one occasion, she
met Corporal Zimmer in the generator shop and talked about
the investigation.[16]

Not long thereafter, Corporal Zimmer too declared that
Petitioner had acted inappropriately and recanted her
earlier denial of any wrongdoing to First Lieutenant Vasel.
But her tale was far more serious than those of the others-
so serious in fact that she was sent to speak with an agent
of the Naval Criminal Investigative Service.[17]

She told the special agent that, a year earlier, while
the unit was in Iraq, she had gone with Petitioner and
Corporal Burgie to a berm just outside of camp.[18]  Once
there, Petitioner forcibly kissed her.[19]  He then tried to
unbuckle her belt.[20]  She was telling him no and blocking his
arms as he tried to put his hands down her pants.[21]  She was
successful in stopping Petitioner from putting his hands
down her pants.[22]  After about five minutes of struggle,
Petitioner got up and walked away.[23]  Corporal Burgie walked
her back to camp.[24]

By the time of Petitioner's trial, Corporal Zimmer's
story had changed again.  She testified before the members

---

[15]  R. at 647.
[16]  R. at 503.
[17]  A.E. XLI.
[18]  A.E. XLI.
[19]  A.E. XLI.
[20]  A.E. XLI.
[21]  A.E. XLI.
[22]  A.E. XLI.
[23]  A.E. XLI.
[24]  A.E. XLI.

that Petitioner had in fact successfully put his hand down
her pants and touched the outside of her vagina.[25]  She also
testified that Petitioner had plied her with alcohol before
indecently assaulting her.[26]

When Corporal Burgie took the stand, now charged as an
accomplice to Petitioner's indecent assault, he invoked his
Fifth Amendment right to remain silent.[27]  Trial Defense
Counsel read before the members Corporal Burgie's testimony
at Petitioner's Article 32 investigation, which consisted of
a general denial of Corporal Zimmer's allegations.[28]
Petitioner did not testify regarding the incident.  A week
after Petitioner was convicted of indecently assaulting
Corporal Zimmer, it was revealed that Corporals Burgie and
Zimmer had perjured themselves at Petitioner's Article 32.[29]

In the days following his trial, Petitioner agreed to
assist trial counsel, who was also detailed to prosecute
Corporal Burgie's case, with the prosecution of Burgie.[30]
Petitioner informed Captain Drier, the trial counsel for
both cases, that he had gone to the berm with Corporals
Zimmer and Burgie where they drank alcohol and then he had
consensual sexual intercourse with Corporal Zimmer.[31]

On January 14, 2005, Corporal Burgie gave a voluntary
statement describing how the two Corporals had accompanied

---

[25] R. at 431-32.
[26] R. at 428.
[27] R. at 588.
[28] R. at 634-651.
[29] Clemency Request ICO SSGT D. A. Hernandez dated 20 Jul. 2005.
[30] *Id.*
[31] *Id.*

Petitioner to the berm and had consumed alcohol.[32]   He sat

and watched as Petitioner had consensual sexual intercourse

with Corporal Zimmer.[33]

Captain Drier wrote a letter to the convening authority

in Petitioner's case requesting clemency.[34]   "Another factor

in mitigation is that the female that SSGT Hernandez was

convicted of sexually assaulting in Iraq, it was later

discovered, has emotional issues and likely misrepresented

her level of consent with the Staff Sergeant during the

encounter."[35]

Captain Drier attempted to convince the convening

authority for Corporal Burgie that he should be prosecuted

for perjury.[36]   The convening authority declined and disposed

of Corporal Burgie's offenses at non-judicial punishment

because Corporal Zimmer's "misrepresentation was perjury,

too, and I only recommended NJP for her."[37]

The convening authority disapproved and dismissed

Petitioner's conviction for indecently assaulting Corporal

Zimmer.[38]

---

[32] *Id.* at Enclosure 5.
[33] *Id.*
[34] *Id.* at Enclosure 4.
[35] *Id.*
[36] *Id.*
[37] *Id.*
[38] General Court-Martial Order 18-05.

V

## Reasons Why Petition Should be Granted

THERE WAS A FRAUD ON THE COURT-MARTIAL
AND THE CONVENING AUTHORITY'S PURPORTED
REASSESSMENT IS INSUFFICIENT TO EXCISE
THE PREJUDICIAL EFFECT OF THE PERJURED
TESTIMONY OF TWO WITNESSES.   ONLY A NEW
TRIAL CAN CURE THIS FRAUD.

Rule for Courts-Martial 1210(f)(3) authorizes a new

trial if there has been a fraud on the court-martial.[39]

"Examples of a fraud on a court-martial which may warrant

granting a new trial are: confessed or proved perjury in

testimony...which clearly had a substantial contributing

effect on a finding of guilty and without which there

probably would not have been a finding of guilty of the

offense."[40]

In this case, the United States has conceded that

Corporal Zimmer "misrepresented her level of consent" and

that this "misrepresentation was perjury."[41]  Corporal

Zimmer's perjured testimony was the sole evidence for

Additional Charge I, a charge Petitioner was convicted of.

The manner in which the government prosecuted this case

made it impossible for the convening authority to purge the

taint of the perjured testimony by dismissing the charge

involving Corporal Zimmer and reassessing the sentence.

Trial Counsel argued to the members that Petitioner has

slowly escalated his misconduct with a "pattern of victim

---

[39] Rule for Courts-Martial 1210(g)(3), Manual for Courts-Martial,
United States (2005 ed.)
[40] Discussion to R.C.M. 1210(g)(3).
[41] Clemency Request ICO SSGT D. A. Hernandez dated 20 Jul. 2005 at
Enclosure 4.

selection"[42] culminating in the indecent assault of Corporal

Zimmer and the wife of another Marine.[43]  "Was this a group

of women who individually made up respective stories, or did

they get together and conspire to make up a bunch of stories

about Staff Sergeant Hernandez?  Or is this a creature of

habit, someone putting out his vibe[44] in a gradually

escalating pattern?"[45]

The defense countered that it was the former.  And, at

least with regard to Corporal Zimmer, they were right.  It

is now impossible, without a new trial, to excise the taint

of the perjured testimony of Corporals Burgie and Zimmer

from Petitioner's trial.

Consider the charge involving Corporal Copeland.  The

government did not bring Petitioner to a general court-

martial for asking Corporal Copeland to stop by a local bar,

an invitation that, as manager of that bar, he generously

extended to many members of the command.[46]  The government

charged Petitioner with that offense solely so it could

argue, as Captain Dreier did, that Petitioner began his

offense in the "minor crime zone" with Corporal Copeland and

continued into the "major crime zone" with the assault of

---

[42] R. at 250.
[43] R. at 243.
[44] Trial Counsel began his opening statement by comparing
Petitioner to Mike Damone, a character who preyed on high school
children in the movie Fast Times at Ridgemont High.  Trial
counsel explained that, like the character in the movie,
Petitioner put out a "vibe and women just respond."  R. at 238-
39.
[45] R. at 250.
[46] R. at 843.

Corporal Zimmer.[47]

The problem is that the most serious charged offense, which was squarely in the "major crime zone," and which involved Corporal Zimmer desperately trying to fight off Petitioner as he forced his hands down her pants in a war zone, never happened. The remaining offenses involve a plausible misunderstanding at the Stilson residence, and a number of minor offenses that, if true, warrant formal counseling or non-judicial punishment.

The remedy afforded by the convening authority, the dismissal of the charge relating to Corporal Zimmer, and the reassessment of Petitioner's sentence, is not authorized by law,[48] and, even if it were, would be insufficient in this case.

In *Sales*, this Court held that a Court of Criminal Appeals may reassess a sentence if it can determine that, absent any error, the sentence adjudged would have been of at least a certain severity.[49] If the error at trial was of constitutional magnitude, then the court must be satisfied beyond a reasonable doubt that its reassessment cured the error.[50] The Court's holding in *Sales* was "based on an understanding that given the substantial experience of the lower court, it could act in accordance with the above-noted

---

[47] R. at 240.
[48] But see, *United States v. Reed*, 33 M.J. 98 (C.M.A. 1991).
[49] 22 M.J. 305 (C.M.A. 1986).
[50] *United States v. Doss*, 57 M.J. 182, 185 (C.A.A.F. 2002).

presumption and accurately reassess an appropriate sentence."[51]

But the Court of Appeals for the Armed Forces has never directly held that a convening authority is equally trained and experienced in the law so as to permit the convening authority to cure constitutional error by reassessing a sentence. In fact, in *United States v. Harris*,[52] Chief Judge Gierke, writing for the dissent, joined by then Chief Judge Crawford, stated: "The majority appears to say that no convening authority could have properly reassessed the sentence and that no reassessment, no matter how generous to appellant, could satisfy the criteria established by this Court."[53]

It does not follow that just because the judges of the lower court are in fact experienced and capable in removing even Constitutional error from trials by reassessing a sentence pursuant to *Sales*, that the untrained line commander is capable of doing the same. This is true even where he is advised by an attorney who is not a sitting or former judge of the lower court and who lacks the experience and judgment possessed by members of a service court of appeals. Thus the convening authority was powerless to reassess Petitioner's sentence pursuant to *Sales* and, upon learning of the perjured testimony in Petitioner's case, should have ordered a new trial take place.

---

[51] *United States v. Moffeit*, 2006 C.A.A.F. LEXIS 419 (2006)(Baker, J., concurring).
[52] 53 M.J. 86, 89 (C.A.A.F. 2000).
[53] 53 M.J. 86, 88 (C.A.A.F. 2000)(Gierke, J., dissenting).

Even if this Court should conclude that *Reed* remains law, and convening authorities are vested with similar powers as the service courts of appeals, the convening authority abused his discretion when he reassessed Petitioner's sentence.

To validly reassess a sentence to purge the effect of the error, the court, or in this case the convening authority, must be able to make a number of determinations.[54] The convening authority must be able to discern the extent of the error's effect on the sentence.[55]  It must be able to conclude that the sentence would have been imposed at trial, absent the error, would have been at least of a certain magnitude.[56]  This conclusion about the sentence that would have been imposed must be made "with confidence."[57]

A dramatic change in the penalty landscape gravitates away from the ability to reassess.[58]  This Court will overturn a lower court's reassessment of a sentence where it cannot be confident that the court of criminal appeals could reliably determine what sentence the members would have imposed.[59]

Petitioner was denied a fair trial required by due process and therefore this error must be rendered harmless beyond a reasonable doubt.  Petitioner was charged with a

---

[54] *United States v. Buber*, 2006 C.A.A.F. LEXIS 308 *9 (C.A.A.F. 2006).
[55] *Id.*
[56] *Id.*
[57] *Id.*
[58] *Id.* at *10.
[59] *Id.*

number of minor offenses and two serious indecent assaults
upon Corporal Zimmer and Mrs. Christy Stilson.  The removal
of one of the two most serious charges dramatically alters
the sentencing landscape in this case so as to make any
reassessment impossible.  It is all but impossible for the
convening authority to have been convinced beyond a
reasonable doubt that his reassessment cured the
Constitutional error in this case.

And the perjured testimony impacted more than the
sentence.  As outlined above, trial counsel argued that the
assault on Corporal Zimmer was part of an escalation of
misconduct and not, as the defense suggested, three or four
disgruntled junior Marines concocting a plot.  "Is it a
trademark?  Well, common plan or scheme.  He had alcohol
when he got out to the ditch with PFC Zimmer.  He had the
tool room empty when he had Castaneda show up." Corporal
Zimmer's testimony spilled over into the other findings
because the government repeatedly asked the members to
consider the charges in that light.

Petitioner has been denied a fair trial.  A conviction
must fall when the prosecution, although not soliciting
false evidence, allows it to go uncorrected when it
appears.[60]  Petitioner's conviction must be set aside and a
rehearing as to findings and sentence authorized.

---

[60] *Giles v. Maryland*, 386 U.S. 66 (1967).

Very Respectfully submitted,

BRIAN L. MIZER
Lieutenant, Judge Advocate General's
Corps, U.S. Navy
716 Sicard Street, Suite 1000
Washington Navy Yard, DC 20374
Telephone: (202) 685-7396
Facsimile: (202) 685-7426
Appellate Defense Counsel
Brian.mizer@navy.mil
Bar Number: 33030

## Certificate of Filing and Service

I certify that the original copy of the forgoing was
hand delivered to the Judge Advocate General of the Navy, to
the Director of the Appellate Government Division, and to
the Navy-Marine Corps Court of Criminal Appeals, on November
27, 2006.

Very Respectfully submitted,

BRIAN L. MIZER
Lieutenant, Judge Advocate
General's Corps,
U.S. Naval Reserve
716 Sicard Street, Suite 1000
Washington Navy Yard, DC 20374
Telephone: (202) 685-7396
Facsimile: (202) 685-7426
Appellate Defense Counsel
Brian.mizer@navy.mil
Bar Number: 33030

13

**IN THE U.S. NAVY-MARINE CORPS COURT OF CRIMINAL APPEALS**
**WASHINGTON NAVY YARD**
**WASHINGTON, D.C.**

**BEFORE**

**J.W. ROLPH**            **E.E. GEISER**            **F.D. MITCHELL**

**UNITED STATES**

**v.**

**DAVID A. HERNANDEZ-ALVERADO**
**Staff Sergeant (E-6), U. S. Marine Corps**

NMCCA 200600037                              Decided 21 November 2006

Sentence adjudged 05 November 2004. Military Judge: D.M. Jones.
Review pursuant to Article 66(c), UCMJ, of General Court-Martial
convened by Commander, 1st Force Service Support Group, MARFORPAC,
Camp Pendleton, CA.

LT BRIAN L. MIZER, JAGC, USNR, Appellate Defense Counsel
Capt ROGER E. MATTIOLI, USMC, Appellate Government Counsel

AS AN UNPUBLISHED DECISION, THIS OPINION DOES NOT SERVE AS PRECEDENT.

GEISER, Senior Judge:

   A general court-martial with enlisted representation
convicted the appellant, contrary to his pleas, of violating a
lawful general order, two specifications of maltreatment of a
subordinate, burglary, and three specifications of indecent
assault, in violation of Articles 92, 93, 129, and 134, Uniform
Code of Military Justice, 10 U.S.C. §§ 892, 893, 929, and 934.
The appellant was sentenced to a dishonorable discharge,
confinement for fifteen years, and reduction to pay grade E-1.
The convening authority disapproved the finding of guilty to one
specification of indecent assault and approved only so much of
the sentence as extended to a dishonorable discharge, confinement
for six years, and reduction to pay grade E-1.

The appellant raises seven assignments of error.[1]  We have examined the record of trial, the assignments of error, and the Government's response.  We address the appellant's contention that the military judge erred by denying a Government request that the court order the appointment of a new trial defense counsel; his contention that the evidence was legally and factually insufficient to support a finding of guilty to Specification 2 of Charge IV; and his assertion of post-trial processing delay.  We have considered the appellant's remaining assignments of error, and find they are without merit.  We conclude that the findings and sentence are correct in law and fact and that no error was committed that was materially prejudicial to the substantial rights of the appellant.  Arts. 59(a) and 66(c), UCMJ.

## Appointment of a New Trial Defense Counsel

The appellant asserts that the military judge erred when he denied a Government request that a new trial defense counsel be appointed to represent the appellant due to the detailed trial defense counsel's heavy workload.  We find this assignment of error to be wholly frivolous.  We observe that the argument advanced by the appellate defense counsel is based in part on a skewed reading of the record of trial and in part on wholly inaccurate factual citations to the record.  We further note that, while counsel's exposition of the appellant's version of events throughout the Appellant's Brief and Assignment of Errors of 25 May 2006 is substantially accurate, the lack of even passing reference to the existence of other contradictory testimony creates the potential to mislead this court.

By way of example, we note that the appellant's brief, at page 15, asserts in connection with this assignment of error that the military judge stated that "he was powerless to enforce Appellant's statutory and Constitutional rights."  What the military judge actually said in connection with a defense motion for a continuance and a Government request that the military judge assign new counsel, was that "there was no authority for the military judge to order counsel to be detailed to the accused."  Record at 24.  The military judge went on to state that the Government had the power to assign additional counsel and need not come to the military judge to accomplish this action.

---

[1] I - Military judge erred by denying a Government request to replace the trial defense counsel due to his inability to provide timely representation; II - prosecutorial misconduct; III - military judge erred by denying the appellant's challenge for cause against Gunnery Sergeant D; IV - legal and factual sufficiency of finding of guilty to Specification 2 of Charge IV; V - military judge erred when he permitted the Government to bolster the testimony of CLS with an excited utterance; VI - military judge erred by failing to grant a mistrial when the Government proceeded on charges about which it knew it would present no evidence; and VII - post-trial processing delay.  In addition, the appellant has a pending motion for a new trial which is denied.

2

In fact, the Government shortly thereafter did assign an assistant trial defense counsel to alleviate the trial defense counsel's workload issues. Record at 29. The military judge granted the defense request for a continuance to allow the new attorney to get up to speed and to have input into any potential defense motions. Record at 30-31.

We share the military judge's frustration that the trial defense counsel, notwithstanding his busy schedule, had failed over several months to request assistance from his chain of command or to have the appellant submit an individual military counsel request. The Government could also have been far more proactive in getting additional assets assigned once they became aware of the issue rather than simply dumping everything in the lap of the military judge to sort out. We commend the military judge for effectively steering counsel to an appropriate solution which ensured the appellant received adequate counsel and sufficient time to prepare for trial. We decline to provide relief.

### Legal and Factual Sufficiency

The test for legal sufficiency is whether, considering the evidence in the light most favorable to the Government, any rational trier of fact could have found the elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979); *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987); *United States v. Reed*, 51 M.J. 559, 561-62 (N.M.Crim.Ct.App. 1999), *aff'd*, 54 M.J. 37 (C.A.A.F. 2000); *see also* Art. 66(c), UCMJ. The test for factual sufficiency is whether, after weighing all the evidence in the record of trial and recognizing that we did not see or hear the witnesses, this court is convinced of the appellant's guilt beyond a reasonable doubt. *Turner*, 25 M.J. at 325; *see also* Art. 66(c), UCMJ.

There are three elements to the offense of indecent assault: (1) that the appellant assaulted a certain person not his spouse in a certain manner; (2) that the acts were done with the intent to gratify the lust or sexual desires of the appellant; and (3) that under the circumstances, the conduct of the appellant was to the prejudice of good order and discipline in the armed forces or was of a nature to bring discredit upon the armed forces. MANUAL FOR COURTS-MARTIAL, UNITED STATES (2002 ed.), Part IV, ¶ 63b. On appeal, the appellant does not seriously contest that there was evidence that he touched the victim's buttocks or that such a touching, if done to gratify his lust or sexual desires, would have been prejudicial to good order and discipline and service discrediting. At issue is whether there was sufficient direct or circumstantial evidence to prove beyond a reasonable doubt that, when touching the victim, the appellant had an intent to gratify his lust or sexual desires.

3

This court is convinced that a rational fact finder could have found the appellant guilty of this offense. The victim testified that he touched her buttocks and that when she turned and gave him a dirty look, he just smiled. She also testified to the appellant's words and actions throughout the day, including that he openly discussed the fact that he and his wife were together "only for the sake of the children," that he inquired into the circumstances of her marriage, that he specifically inquired whether her husband "satisfied her," that he openly discussed how long it had been since he'd had sex, and that he was repeatedly asking her for a kiss. Record at 491-93. The witness also testified that during a drive to inspect the 22 area, the appellant began rubbing her shoulders and playing with her hair while commenting on how nice her hair was. Record at 497. After weighing all the evidence in the record of trial and recognizing that we did not see or hear the witnesses, this court is convinced of the appellant's guilt to Specification 2 of Charge II beyond a reasonable doubt. *Turner*, 25 M.J. at 325.

### Post-Trial Delay

The appellant also asserts that a delay of "more than one year and six months" from the date sentence was announced to the date the case was docketed with this court is unreasonable. We consider four factors in determining if post-trial delay violates an appellant's due process rights: (1) length of the delay; (2) reasons for the delay; (3) the appellant's assertion of the right to a timely appeal; and (4) prejudice to the appellant. *United States v. Jones*, 61 M.J. 80, 83 (C.A.A.F. 2005)(citing *Toohey v. United States*, 60 M.J. 100, 102 (C.A.A.F. 2004)). If the length of the delay is not unreasonable, further inquiry is not necessary. If we conclude that the length of the delay is "facially unreasonable," however, we must balance the length of the delay against the other three factors. *Id*.

In the instant case, there was a delay of about 480 days from the date of sentencing to the date the case was docketed with this court. While much of the delay was reasonable, a delay of 147 days between the convening authority's action and docketing with this court was not. We find this period of unexplained delay to be facially unreasonable triggering a due process review. *See United States v. Moreno*, 63 M.J. 129 (C.A.A.F 2006); *United States v. Brown*, 62 M.J. 602, 605 (N.M.Ct.Crim.App 2005)(en banc).

We balanced the length of delay in this case in the context of the three remaining *Jones* factors. Regarding the second factor, reasons for the delay, the Government offers no explanation why it took 147 days to docket this case. We note that some explanation, even an acknowledgement of simple negligence on the part of the convening authority, is better than no explanation whatsoever which implies a more callous disregard

for the appellant's rights and this court's decisions.  With respect to the third factor, we find that the appellant first asserted his right to timely post-trial review in a 20 January 2006 petition for an extraordinary writ filed with this court. We note that the case was docketed 39 days later.  Finally, regarding the fourth factor, the appellant makes no assertion of and this court finds no evidence of, material prejudice to a substantial right resulting from post-trial delay in this case. The appellant asks this court to presume prejudice, however, based on the passage of time.  Our superior court has clearly stated that the mere passage of time, standing alone, does not constitute prejudice.  *Moreno*, 63 M.J. at 142.  Considering all four factors, we conclude that there has been no due process violation due to post-trial delay.

We next consider whether this is an appropriate case to exercise our authority to grant relief under Article 66(c), UCMJ, in the absence of a due process violation.  Having considered the post-trial delay in light of our superior court's guidance in *Toohey* and *United States v. Tardif*, 57 M.J. 219, 224 (C.A.A.F. 2002), and considering the factors we explained in *Brown*, we decline to provide relief.

### Conclusion

The approved findings and sentence are affirmed.

Chief Judge ROLPH and Judge MITCHELL concur.

For the Court

R.H. TROIDL
Clerk of Court

### IN THE UNITED STATES COURT OF APPEALS
### FOR THE ARMED FORCES

| | |
|---|---|
| UNITED STATES, | APPELLANT'S SUPPLEMENT TO PETITION FOR GRANT OF REVIEW |
| Appellee, | |
| | USCA Dkt. No. 07-_____/MC |
| v. | Crim.App. No. 200600037 |
| David A. HERNANDEZ-ALVERADO, Staff Sergeant (E-6) U.S. Marine Corps, | |
| Appellant. | |

## TO THE HONORABLE, THE JUDGES OF THE UNITED STATES COURT OF APPEALS FOR THE ARMED FORCES

BRIAN L. MIZER
LT, JAGC, USN
Bar No. 33030
Appellate Defense Counsel
Navy-Marine Corps Appellate Review Activity
716 Sicard Street, SE, Suite 1000
Washington Navy Yard, D.C. 20374
(202) 685-7290

# FILE COPY

3

## QUESTIONS PRESENTED

I.   DID THE MILITARY JUDGE ERR WHEN HE DENIED A GOVERNMENT
     MOTION, INTENDED TO PROTECT APPELLANT'S RIGHTS TO
     COUNSEL AFFORDED HIM BY STATUTE AND THE CONSTITUTION,
     TO REPLACE TRIAL DEFENSE COUNSEL WHO, DUE TO OTHER
     CASELOAD COMMITMENTS, WAS UNABLE TO PROVIDE EFFECTIVE
     AND TIMELY REPRESENTATION TO APPELLANT?

II.  DID TRIAL COUNSEL COMMIT PROSECUTORIAL MISCONDUCT
     BY 1) COMPARING APPELLANT TO CHARACTERS IN MOVIES
     WHO PREYED ON HIGH SCHOOL CHILDREN 2) BY ASKING
     APPELLANT IF HIS WIFE WAS SUSPICIOUS OF HIM WHEN
     HE WAS AROUND OTHER WOMEN WHEN TRIAL COUNSEL IN
     FACT HAD NO GOOD FAITH BASIS TO ASK THAT QUESTION
     CONTRARY TO WHAT HE ASSERTED TO THE TRIBUNAL 3) BY
     ARGUING THAT "NOBODY ON THE PLANET" BELIEVED
     APPELLANT'S STORY AND BY COMPARING APPELLANT'S
     DEFENSE AS TO HOW HE ENTERED THE [S] HOME WITH
     ALIENS WHO USED A "TRACTOR BEAM." 4) BY ASKING THE
     MEMBERS TO PUT THEMSELVES IN APPELLANT'S SHOES
     WHEN HE WAS FIRST QUESTIONED BY MILITARY POLICE AT
     HIS HOME 5) AND BY ASKING APPELLANT'S WIFE "WHY
     FIVE WOMEN WOULD LIE ABOUT YOUR HUSBAND SEXUALLY
     ASSAULTING THEM" WHEN APPELLANT WAS ONLY CHARGED
     WITH THREE SPECIFICATIONS OF INDECENT ASSAULT?

III. DID THE MILITARY JUDGE ERR WHEN HE DECLINED TO ADHERE
     TO THE LIBERAL GRANT MANDATE AND DENIED APPELLANT'S
     CHALLENGE FOR CAUSE OF GUNNERY SERGEANT [D]?

IV.  DID THE MILITARY JUDGE ERR WHEN HE PERMITTED SERGEANT
     [K] TO BOLSTER THE TESTIMONY OF MRS. [S] BY RECOUNTING
     WHAT SHE TOLD HIM ON THE NIGHT OF DECEMBER 12, 2003, ON
     THE GROUNDS THAT THEIR DISCUSSION WAS AN EXCITED
     UTTERANCE BY MRS. [S]?

V.   DID THE MILITARY JUDGE ERR WHEN HE DECLINED TO GRANT A
     MISTRIAL WHERE THE GOVERNMENT PROCEEDED TO TRIAL ON
     CHARGES THAT THE GOVERNMENT KNEW AT THE OUTSET OF
     APPELLANT'S TRIAL THAT IT WOULD NOT INTRODUCE ANY
     EVIDENCE TO SUPPORT?

**TABLE OF CONTENTS**

Page

Questions Presented .......................................ii

Table of Authorities......................................v

Statement of Statutory Jurisdiction.......................1

Statement of the Case.....................................1

Statement of Facts........................................2

Issues Presented.................................9,19,26,29,32

    I.     THE MILITARY JUDGE ERRED WHEN HE DENIED A
            GOVERNMENT MOTION, INTENDED TO PROTECT APPELLANT'S
            RIGHTS TO COUNSEL AFFORDED HIM BY STATUTE AND THE
            CONSTITUTION, TO REPLACE TRIAL DEFENSE COUNSEL
            WHO, DUE TO OTHER CASELOAD COMMITMENTS, WAS UNABLE
            TO PROVIDE EFFECTIVE AND TIMELY REPRESENTATION TO
            APPELLANT ........................................... 9

    II.    TRIAL COUNSEL COMMITTED PROSECUTORIAL MISCONDUCT
            BY 1) COMPARING APPELLANT TO CHARACTERS IN MOVIES
            WHO SEXUALLY PREYED ON HIGH SCHOOL CHILDREN 2) BY
            ASKING APPELLANT IF HIS WIFE WAS SUSPICIOUS OF HIM
            WHEN HE WAS AROUND OTHER WOMEN WHEN TRIAL COUNSEL
            IN FACT HAD NO GOOD FAITH BASIS TO ASK THAT
            QUESTION CONTRARY TO WHAT HE ASSERTED TO THE
            TRIBUNAL 3) BY ARGUING THAT "NOBODY ON THE PLANET"
            BELIEVED APPELLANT'S STORY AND BY COMPARING
            APPELLANT'S DEFENSE AS TO HOW HE ENTERED THE [S]
            HOME WITH ALIENS WHO USED A "TRACTOR BEAM." 4) BY
            ASKING THE MEMBERS TO PUT THEMSELVES IN
            APPELLANT'S SHOES WHEN HE WAS FIRST QUESTIONED BY
            MILITARY POLICE AT HIS HOME 5) AND BY ASKING
            APPELLANT'S WIFE "WHY FIVE WOMEN WOULD LIE ABOUT
            YOUR HUSBAND SEXUALLY ASSAULTING THEM" WHEN
            APPELLANT WAS ONLY CHARGED WITH THREE
            SPECIFICATIONS OF INDECENT ASSAULT.................. 19

    III.  THE MILITARY JUDGE ERRED WHEN HE DECLINED TO
            ADHERE TO THE LIBERAL GRANT MANDATE AND DENIED
            APPELLANT'S CHALLENGE FOR CAUSE OF GUNNERY
            SERGEANT [D] ....................................... 26

    IV.   THE MILITARY JUDGE ERRED WHEN HE PERMITTED
            SERGEANT [K] TO BOLSTER THE TESTIMONY OF MRS. [S]
            BY RECOUNTING WHAT SHE TOLD HIM ON THE NIGHT OF
            DECEMBER 12, 2003, ON THE GROUNDS THAT THEIR
            CONVERSATION WAS AN EXCITED UTTERANCE BY MRS. [S]... 28

V.    THE MILITARY JUDGE ERRED WHEN HE DECLINED TO GRANT
      A MISTRIAL WHERE THE GOVERNMENT PROCEEDED TO TRIAL
      ON CHARGES THAT THE GOVERNMENT KNEW AT THE OUTSET
      OF APPELLANT'S TRIAL THAT IT WOULD NOT INTRODUCE
      ANY EVIDENCE TO SUPPORT............................ 32

Certificate of Service.........................................40

**TABLE OF AUTHORITIES**

Page

UNITED STATES SUPREME COURT CASES

*Berger v. United States*, 295 U.S. 78 (1935) .............. 20

*Frazier v. Cupp*, 394 U.S. 731 (1969) .................... 34

UNITED STATES COURT OF APPEALS FOR THE ARMED FORCES AND
COURT OF MILITARY APPEALS CASES

*United States v. Blocker*, 32 M.J. 281 (C.M.A.
1991) .................................................. 25

*United States v. Chandler*, 39 M.J. 119 (C.M.A.
1994) .................................................. 28

*United States v. Cooper*, 58 M.J. 54 (C.A.A.F.
2003) .................................................. 15

*United States v. Dale*, 42 M.J. 384 (C.A.A.F.
1995) .................................................. 27

*United States v. Donaldson*, 58 M.J. 477 (C.A.A.F.
2003) .................................................. 30

*United States v. Fletcher*, 62 M.J. 175 (C.A.A.F.
2005) .................................................. 20

*United States v. Golston*, 53 M.J. 61 (C.A.A.F.
2000) .................................................. 18

*United States v. Goodwin*, 5 U.S.C.M.A. 647, 659
(C.M.A. 1955) ......................................... 12

*United States v. Meek*, 44 M.J. 1 (C.A.A.F. 1996) ...... 20,25

*United States v. Miles*, 58 M.J. 192 (C.A.A.F.
2003) .................................................. 27

*United States v. Moolick*, 53 M.J. 174 (C.A.A.F.
2000) .................................................. 29

*United States v. Moreno*, 63 M.J. 129 (C.A.A.F. 2006) .................................................. 16

*United States v. Rodriguez*, 60 M.J. 87 (C.A.A.F. 2004) .................................................. 21

*United States v. Rome*, 47 M.J. 467 (C.A.A.F. 1998) .................................................. 27

*United States v. Rosser*, 6 M.J. 267 (C.M.A. 1979) ........ 34

*United States v. Smart*, 21 M.J. 15 (C.M.A. 1985) ......... 27

*United States v. Turner*, 25 M.J. 324 (C.M.A. 1987) .................................................. 25

*United States v. Wiesen*, 56 M.J. 172 (C.A.A.F. 2001) .................................................. 27

FEDERAL CIRCUIT COURT CASES

*Dole v. USA Waste Services Inc.*, 100 F.3d 1384 (8th Cir. 1996) .................................................. 24

*Spray-Rite Serv. Corp v. Monsanto Co.*, 684 F.2d 1226 (7th Cir. 1982) .................................................. 24

*United States v. Saltzman*, 984 F.2d 1087 (10th Cir. 1993) .................................................. 15

FEDERAL DISTRICT COURT CASES

*Galullo v. Federal Express Corp.*, 937 F. Supp. 392 (E.D. Pa. 1996) .................................................. 31

## STATEMENT OF STATUTORY JURISDICTION

The Navy-Marine Corps Court of Criminal Appeals had jurisdiction pursuant to Article 66(b)(1), Uniform Code of Military Justice, 10 U.S.C. § 866(b)(1) (2006).  The jurisdiction of this Court is invoked under Article 67(a)(3), UCMJ, 10 U.S.C. § 867(a)(3)(2006).

## STATEMENT OF THE CASE

On November 5, 2004, Appellant was convicted, contrary to his pleas, by a general court-martial, composed of members with enlisted representation, of one specification of violating a lawful order, two specifications of maltreatment, one specification of burglary, and three specifications of indecent assault in violation of articles 92, 93, 129, and 134 Uniform Code of Military Justice, 10 U.S.C. §§ 892, 893, 929, and 934 (2006).

Appellant was sentenced to fifteen years confinement, reduction in rate to E-1, and a dishonorable discharge.  Because, according to trial counsel, one of Appellant's alleged victims, Lance Corporal April Zimmer, perjured herself at Appellant's court-martial, the convening authority disapproved and dismissed the findings with regard to Appellant's alleged indecent assault of Lance Corporal Zimmer.  Citing *United States v. Sales*,[1] the convening authority approved only six years confinement, reduction in rate to E-1, and a dishonorable discharge.

---

[1] 22 M.J. 305 (C.M.A. 1986).

1

On November 21, 2006, the lower court affirmed the findings and sentence.[2]

Appellant petitioned this Court for grant of review on November 22, 2006.

### STATEMENT OF FACTS

In the fall of 2003, Lance Corporal Tamarijn A. Walsh was in a meeting with her husband, also a Marine, and her husband's career counselor.[3]  The career planner asked her if she had any reservations about her husband reenlisting in the Marine Corps.[4] She responded, "I have seen a lots of people get away with lots of things."[5]  She went on to tell the counselor, and later her chain of command, that months earlier, on July 14, 2003, she had been sexually harassed while she was on duty with Appellant.[6] And, while she passed Appellant at the duty desk, his hand brushed against her buttocks.[7]  Sergeant Aceves, also on duty that night, did not see Appellant touch Lance Corporal Walsh's buttocks or anything inappropriate take place.[8]

---

[2] *United States v. Hernandez-Alverado*, No. 200600037 (N-M. Ct. Crim. App. 2006).

[3] R. at 501.

[4] R. at 501.

[5] *Id.*

[6] R. at 491, 493, 495, 502.

[7] R. at 495, 510.

[8] R. at 540, 542.

Appellant's command launched an investigation and appointed First Lieutenant Denise D. Vasel to lead it.[9]  The battalion Sergeant Major ordered all females to report to First Lieutenant Vasel.[10]  Corporal Zimmer described the meeting.  "In December, the battalion had a meeting with a bunch of females.  And a female lieutenant asked us if he, staff sergeant, did anything to us.  I told her he didn't."[11]

But others said he had.  Lance Corporal S. L. Castaneda said that Appellant had sexually harassed her while the unit was deployed to Kuwait eight months earlier.[12]  Corporal Tiffany A. Copeland said that, two years earlier, Appellant had told her to call him by his first name and had invited her to a bar.[13]

After the investigation broke, Corporal William P. Burgie testified that, on several occasions, he saw several of the complainants out by the smoke pit discussing the ongoing investigation of Appellant.[14]  One of the female Marines told Burgie that their conversation was none "of my fucking business and to go somewhere else and smoke."[15]  Lance Corporal Walsh

---

[9] Command Investigation  Into Allegations of Sexual Harassment in the case of Tamarijn A. Walsh dated 3 Nov. 2003.

[10] R. at 579.

[11] R. at 454.

[12] R. at 267.

[13] R. at 563-64, 582.

[14] R. at 646.

[15] R. at 647.

testified that, on one occasion, she met Corporal Zimmer in the
generator shop and talked about the investigation.[16]

Not long thereafter, Corporal Zimmer also declared that
Appellant had acted inappropriately and recanted her earlier
denial of any wrongdoing to First Lieutenant Vasel. But her tale
was far more serious than those of the others-so serious in fact
that she was sent to speak with an agent of the Naval Criminal
Investigative Service.[17]

She told the special agent that, a year earlier, while the
unit was in Iraq, she had gone with Appellant and Corporal Burgie
to a berm just outside of camp.[18]  Once there, Appellant forcibly
kissed her.[19]  He then tried to unbuckle her belt.[20]  She told him
no and was blocking his arms as he tried to put his hands down
her pants.[21]  She was successful in stopping Appellant from
putting his hands down her pants.[22]  After about five minutes of
struggle, Appellant got up and walked away.[23]  Corporal Burgie
walked her back to camp.[24]

---

[16] R. at 503.

[17] A.E. XLI.

[18] A.E. XLI.

[19] A.E. XLI.

[20] A.E. XLI.

[21] A.E. XLI.

[22] A.E. XLI.

[23] A.E. XLI.

[24] A.E. XLI.

By the time of Appellant's trial, Corporal Zimmer's story had changed again. She testified before the members that Appellant had in fact successfully put his hand down her pants and touched the outside of her vagina.[25] She also testified that Appellant had plied her with alcohol before indecently assaulting her.[26]

When Corporal Burgie took the stand, now charged as an accomplice to Appellant's indecent assault, he invoked his Fifth Amendment right to remain silent.[27] Trial Defense Counsel read before the members Corporal Burgie's testimony at Appellant's Article 32 investigation, which consisted of a general denial of Corporal Zimmer's allegations.[28] Appellant did not testify regarding the incident. A week after Appellant was convicted of indecently assaulting Corporal Zimmer, it was revealed that Corporals Burgie and Zimmer had perjured themselves at Appellant's trial.[29]

In the days following his trial, Appellant agreed to assist trial counsel, who was also detailed to prosecute Corporal Burgie's case, with the prosecution of Burgie.[30] Appellant informed Captain Drier, the trial counsel for both cases, that he had gone to the berm with Corporals Zimmer and Burgie where they

---

[25] R. at 431-32.

[26] R. at 428.

[27] R. at 588.

[28] R. at 634-651.

[29] Clemency Request ICO SSGT D. A. Hernandez dated 20 Jul. 2005.

[30] *Id.*

drank alcohol and then he had consensual sexual intercourse with Corporal Zimmer.[31]

On January 14, 2005, Corporal Burgie gave a voluntary statement describing how the two Corporals had accompanied Appellant to the berm and had consumed alcohol.[32] He sat and watched as Appellant had consensual sexual intercourse with Corporal Zimmer.[33]

Captain Drier wrote a letter to the convening authority in Appellant's case requesting clemency.[34] "Another factor in mitigation is that the female that SSGT Hernandez was convicted of sexually assaulting in Iraq, it was later discovered, has emotional issues and likely misrepresented her level of consent with the Staff Sergeant during the encounter."[35]

Captain Drier attempted to convince the convening authority for Corporal Burgie that he should be prosecuted for perjury.[36] The convening authority declined and disposed of Corporal Burgie's offenses at non-judicial punishment because Corporal Zimmer's "misrepresentation was perjury, too, and I only recommended NJP for her."[37]

---

[31] *Id.*

[32] *Id.* at Enclosure 5.

[33] *Id.*

[34] *Id.* at Enclosure 4.

[35] *Id.*

[36] *Id.*

[37] *Id.*

The convening authority disapproved and dismissed Appellant's conviction for indecently assaulting Corporal Zimmer.[38]

On December 12, 2003, as Appellant's battalion was holding meetings with Corporal Zimmer and the other females from his unit, Appellant was home with his family and friends.[39] Mrs. Christy Stilson, who lived two doors down from Appellant with her husband, Sergeant Matthew E. Stilson, arrived home and Appellant invited her to his family's home to watch movies since her husband was on duty that night.[40]

Mrs. Stilson changed into her pajamas and went to Appellant's home where she joined Appellant, his family, and several neighbors as they prepared to watch "Bad Boys II."[41] Shortly after she arrived, Appellant announced that he was going to run to the store and buy more beer. But Mrs. Stilson insisted that she had beer at home and that Appellant should just go to her house and get the beer from her refrigerator.[42] Mrs. Stilson had left the door unlocked and Appellant let himself in and retrieved the beer.[43]

Later that evening, Mrs. Stilson suggested that Appellant return to her home and retrieve a tray of potato chips for the

---

[38] General Court-Martial Order 18-05.

[39] R. at 319.

[40] R. at 319.

[41] R. 320.

[42] R. at 676.

[43] *Id.*

7

group.[44]  He brought the chips back to the house and the group consumed several bags out of the tray.  After the movie, Mrs. Stilson announced that she had to get up early the next morning and walked home-but she forgot her tray of chips.[45]

After everyone had left for the evening, and his family had gone to bed, Appellant set about cleaning the family home.[46]  It was then he noticed Christy's chips.  Appellant took them to her home two doors down intending to leave them on the porch.[47]  But when he got there, something was wrong.[48]  The front door of the Stilson home was ajar.[49]

Worried, Appellant entered the Stilson home and called out for Christy.[50]  There was no answer.[51]  After searching the home he opened the door to her bedroom and approached her bed.  He shook her leg and yelled at her again to see if she was okay.[52]

Christy's version of events was radically different. Christy testified that she woke up to someone rubbing her vagina outside of her pajamas.[53]  She assumed it was her husband because

---

[44] R. at 320, 677.

[45] R. at 679, 711.

[46] R. at 713.

[47] R. at 715.

[48] R. at 681.

[49] Id.

[50] R. at 686.

[51] Id.

[52] R. at 687.

[53] R. at 330.

he often woke her up at night by rubbing her vagina so that they could engage in intercourse.[54]  As she opened her eyes, still hazy from sleep, she saw Appellant by her bed.[55]

She leapt out of bed and asked Appellant what he was doing in her bedroom.[56]  He responded that he had come to the house to return her chips.[57]  She told Appellant to "get the fuck out of her house" or she would shoot him.[58]  Not wanting to be shot, Appellant left.[59]

Additional facts necessary to resolve the issues are set forth, *infra*.

### REASONS TO GRANT REVIEW

#### I

> THE MILITARY JUDGE ERRED WHEN HE DENIED A
> GOVERNMENT MOTION, INTENDED TO PROTECT
> APPELLANT'S RIGHTS TO COUNSEL AFFORDED HIM BY
> STATUTE AND THE CONSTITUTION, TO REPLACE
> TRIAL DEFENSE COUNSEL WHO, DUE TO OTHER
> CASELOAD COMMITMENTS, WAS UNABLE TO PROVIDE
> EFFECTIVE AND TIMELY REPRESENTATION TO
> APPELLANT.

Appellant's trial was scheduled for August 23, 2004.[60]  On August 17, 2004, five days before Appellant's trial was to begin, trial defense counsel filed a motion for a continuance citing his

---

[54] R. at 347-48.

[55] R. at 331.

[56] R. at 333.

[57] R. at 333.

[58] R. at 335.

[59] R. at 336.

[60] R. at 12.

extremely busy trial schedule, heavy caseload of thirty-six cases, and collateral duty assignments as the basis for his request.[61]  Counsel informed the court that he had "not had enough time to talk to his client and to prepare for trial."[62]  He had filed no motions in advance of Appellant's general court-martial.[63]

The military judge asked counsel how a continuance was going to enable him to adequately represent his client if his caseload remained the same.[64]  Counsel responded that a continuance would not help, and that he was seeking to have a new defense counsel assigned to the case.[65]  The government moved to have the military judge order a new defense counsel be assigned to the case to protect Appellant's rights.[66]  The military judge denied the motion, saying he was not prepared "to do that at this juncture."[67]  He granted the defense request for a continuance until October 4, 2004.[68]

Nine days later, on August 26, 2004, a new military judge, Major Ware, convened another pre-trial session.[69]  He immediately

---

[61] R. at 12.

[62] R. at 12.

[63] R. at 13.

[64] R. at 15-16.

[65] *Id.*

[66] R. at 16, 18.

[67] R. at 18.

[68] R. at 18.

[69] R. at 23.

addressed the government's previous request that the court order new counsel to protect Appellant's rights.[70]  "Now there is no authority for the military judge to order counsel to be detailed to the accused.  However, it's clear the government has the ability to require another counsel be detailed."[71]  The military judge again denied the motion.[72]

Trial defense counsel noted that replacement counsel had not been detailed and that he was trying to get Lieutenant Booker, from the Naval Legal Service Office in San Diego, detailed to the case.[73]  The military judge responded, "I don't like this delay. I don't understand when you tell the Court you are so busy, and now it's been a week and you still haven't done anything formally in writing."[74]

After a recess, trial defense counsel announced that Major Boucher would be detailed to the case to assist trial defense counsel that same day.[75]  But Major Boucher's appearance apparently did little to help trial defense counsel prepare for Appellant's trial.

While litigating a motion for prosecutorial misconduct, the military judge asked trial defense counsel if he had sought testimonial immunity for Corporal Burgie, the only other

---

[70] R. at 24.

[71] R. at 24.

[72] R. at 24-25.

[73] R. at 26.

[74] R. at 28.

[75] R. at 29.

eyewitness to Appellant's alleged indecent assault of Corporal Zimmer.[76] The following colloquy took place:

DC   We have not actually done that, sir.

MJ   How come?

DC   Can the Court order testimonial immunity for Corporal Burgie, sir?

MJ   I asked if you had requested it from the convening authority.  If you knew how to get testimonial immunity, you'd know it comes from the general court-martial convening authority.  It doesn't come from the judge.[77]

On September 22, 2004, twelve days before Appellant's second trial date, trial defense counsel was again before the court asking for more time to prepare Appellant's case for trial until November 1, 2004.[78]  The military judge responded that he was "loathe to do that."[79]  He noted that he was "disturbed that testimonial immunity [hadn't] been requested.  And that is one of the preliminary steps that should've been made.  I'm concerned that the request for experts weren't filed with the general court-martial convening authority...I am concerned that other discover issues are probably lurking out there."[80]  The military judge again continued the trial this time until November 1, 2004.[81]

---

[76] R. at 64.

[77] R. at 64.

[78] R. at 87.

[79] R. at 87.

[80] R. at 88.

[81] *Id.*

Before adjourning the court-martial, the military judge warned counsel: "I don't want to come in on 4 November—or 1 November and have either counsel say there is one more last thing that they didn't think about doing that they should've done.  You are getting far more time than is necessary to get prepared, in my opinion...Staff Sergeant Hernandez has a right to a trial somewhat a timely and speedy [sic].  And he is expecting both of you, all of you, to do your jobs so that we can get this thing going 1 November."[82]

In the weeks leading up to trial, trial defense counsel finally produced two motions.  The first was a motion for appropriate relief from prosecutorial misconduct.[83]  Trial defense counsel alleged that trial counsel had charged Corporal Burgie with an offense simply to make him unavailable to testify on behalf of Appellant's at his trial.[84]  The military judge summed up the motion and the evidence offered by trial defense counsel:

> MJ    And your evidence of that is because Captain Dreier smiled when Captain Martell said that he is not going to be able to testify, and he said, I am not stupid?
>
> DC    Yes, sir.
>
> MJ    And you believe that meets your burden?[85]

The military judge denied the motion primarily because Corporal Burgie was then scheduled to be tried before Appellant and could then be ordered to appear and testify at Appellant's trial.[86]

---

[82] R. at 88.

[83] R. at 104.

[84] R. at 103-04.

[85] R. at 105.

Trial defense counsel's second motion was for the government
to produce an expert to determine whether or not Mrs. Stilson was
suffering from post-traumatic stress disorder from sexual abuse
she suffered from as a child.[87]  Trial defense counsel again
failed to produce any evidence to support his request.[88]  The
military judge responded:  "Captain Nelson, I'm going to say this
probably about as clearly as possible.  If you want me to
consider that, you have to have evidence...The bottom line is I
have nothing which to make a ruling."[89]  "You have come to me with
nothing more than a theory and an Internet web page.  That's just
not sufficient enough to cut it."[90]  He then denied the defense
motion unless the defense produced some evidence to support it.[91]
They never did.

Meanwhile, trial defense counsel had not pursued testimonial
immunity.[92]  He never did.  Instead he insisted that Corporal
Burgie be produced at trial.[93]  When called to testify, Corporal
Burgie invoked his right to remain silent.[94]  Appellant's trial

---

[86]  R. at 110, 112.

[87]  R. at 123-24.

[88]  R. at 134.

[89]  R. at  134.

[90]  R. at 132.

[91]  R. at 134.

[92]  R. at 110.

[93]  R. at 117.

[94]  R. at 588.

14

began November 1, 2004, seventy days after it was initially scheduled to begin.

During sentencing, trial counsel asked that the members sentence Appellant to seven years confinement.[95]  They sentenced him to fifteen years confinement.[96]  In his letter supporting clemency, trial counsel opined on the harshness of Appellant's sentence.  "The reason for the difference between the adjudged 15 year sentence and my recommendation of seven years lay in SSgt Hernandez's defense lawyers being less experienced than me and, with my preparation and some luck in random rulings and witnesses' choice of words, I was able to present SSgt Hernandez in his most foul light and make almost irrelevant his defense counsel's counter arguments.  In short, the jury considered a one-sided argument."[97]

This Court reviews de novo claims that an appellant has been denied his due process right to timely trial.[98]  The courts share, with the government, the responsibility to protect the speedy trial rights of both the defendant and society.[99]  In the same way that the government "must provide adequate staffing within the Appellate Defense Division to fulfill its responsibility under

---

[95] Clemency Request ICO SSGT D. A. Hernandez dated 20 Jul. 2005, at enclosure 4.

[96] R. at 1027.

[97] Letter from Captain A. S. Drier to Commanding General, 1st Force Service Support Group.

[98] *United States v. Cooper*, 58 M.J. 54, 58 (C.A.A.F. 2003).

[99] *United States v. Saltzman*, 984 F.2d 1087, 1091 (10th Cir. 1993).

the UCMJ to provide competent and timely representation,"[100] so too must the government adequately staff the trial defense divisions so as to provide defendants with effective representation in a timely manner. And, in the same way that it is the responsibility of this Court to ensure the timely management and disposition of cases docketed at this Court,[101] it is the responsibility of the military judge to ensure the timely management and disposition of cases at court-martial.

Thus the military judge's statement that he was powerless to enforce Appellant's statutory and Constitutional rights to counsel, and that if Appellant desired counsel he would have to ask the government for counsel, is a misstatement of law.[102] In fact, it was primarily his responsibility to do something about trial defense counsel's inability to prepare for Appellant's trial because of his other caseload commitments. Thus the military judge abused his discretion when he denied the government's request, joined by trial defense counsel, to appoint new counsel for Appellant to protect Appellant's rights.

The record demonstrates that Appellant was tried seventy days later than he should have been and that trial defense counsel was not prepared to defend Appellant. The end result was a sentence that was twice what the government sought. Trial counsel's assertion that that the jury "considered a one-sided

---

[100] *United States v. Moreno*, 63 M.J. 129, *23 (C.A.A.F. 2006).

[101] *Id.*

[102] R. at 24.

argument" is half right.  Appellant was afforded a "one-sided" trial.

The lower court found this assignment of error to be "wholly frivolous" and based in part "wholly inaccurate factual citations to the record."[103]  The Court provided an example of Counsel's inaccuracy:

> Appellant's brief, at page 15, asserts in connection this assignment of error that the military judge stated that 'he was powerless to enforce Appellant's statutory and Constitutional rights.'  What the military judge actually said in connection with a defense motion for a continuance and a Government request that the military judge assign new counsel, was that 'there was no authority for the military judge to order counsel to be detailed to the accused.'[104]

On page 10 of Appellant's brief filed with the lower court is the following citation to the record:

> "Now there is no authority for the military judge to order counsel to be detailed to the accused.  However, it's clear the government has the ability to require another counsel be detailed."[105]

Thus it is entirely unclear how the Court's example of Counsel's citation to the record in this case is even in part "wholly inaccurate."[106]

In addressing the merits of this assignment of error, the lower court correctly noted that the military judge granted a

---

[103] *Hernandez-Alverado*, No. 200600037 at *2 (N-M. Ct. Crim. App. 2006).

[104] *Id.*

[105] R. at 24.

[106] *Hernandez-Alverado*, No. 200600037 at *2 (N-M. Ct. Crim. App. 2006).

defense request for continuance in part to allow assistant trial counsel to prepare motions for trial.[107]  But despite the presence and assistance of assistant trial defense counsel, weeks later, on September 22, 2004, and twelve days before Appellant's second trial date, trial defense counsel was again before the court asking for more time to prepare Appellant's case for trial until November 1, 2004.[108]

In response, the military judge summed up the prejudice to Appellant generated by the government's failure to properly staff the trial defense office.  He noted that he was "disturbed that testimonial immunity [hadn't] been requested.  And that is one of the preliminary steps that should've been made.  I'm concerned that the request for experts weren't filed with the general court-martial convening authority...I am concerned that other discover issues are probably lurking out there."[109]

WHEREFORE, this Honorable Court should grant Appellant's petition because the lower court has decided a question of law in a way in conflict with applicable decisions of this Court. Additionally, the lower court has sanctioned such a departure from the normal course of judicial proceedings so as to call for an exercise of this Court's supervisory powers.

---

[107] *Id.*

[108] R. at 87.

[109] R. at 88.

II

> TRIAL COUNSEL COMMITTED PROSECUTORIAL
> MISCONDUCT BY 1) COMPARING APPELLANT TO
> CHARACTERS IN MOVIES WHO SEXUALLY PREYED ON
> HIGH SCHOOL CHILDREN 2) BY ASKING APPELLANT
> IF HIS WIFE WAS SUSPICIOUS OF HIM WHEN HE WAS
> AROUND OTHER WOMEN WHEN TRIAL COUNSEL IN FACT
> HAD NO GOOD FAITH BASIS TO ASK THAT QUESTION
> CONTRARY TO WHAT HE ASSERTED TO THE TRIBUNAL
> 3) BY ARGUING THAT "NOBODY ON THE PLANET"
> BELIEVED APPELLANT'S STORY AND BY COMPARING
> APPELLANT'S DEFENSE AS TO HOW HE ENTERED THE
> [S] HOME WITH ALIENS WHO USED A "TRACTOR
> BEAM." 4) BY ASKING THE MEMBERS TO PUT
> THEMSELVES IN APPELLANT'S SHOES WHEN HE WAS
> FIRST QUESTIONED BY MILITARY POLICE AT HIS
> HOME 5) AND BY ASKING APPELLANT'S WIFE "WHY
> FIVE WOMEN WOULD LIE ABOUT YOUR HUSBAND
> SEXUALLY ASSAULTING THEM" WHEN APPELLANT WAS
> ONLY CHARGED WITH THREE SPECIFICATIONS OF
> INDECENT ASSAULT.

On November 1, 2004, trial counsel gave the following opening statement to the members:

> I believe everyone has seen the movie "Fast Times at
> Ridgemont High." If you haven't you may not have
> encountered the character of Mike Damone, who plays a
> kind of slick guy who is trying to advise his friend,
> his nerdy friend, Rat, on women. And he states, about
> himself, "I put out the vibe and women just respond."
> Rat's response to that is, "Well, if you put out the
> vibe on 30 million women, naturally someone is going to
> respond." That's "the vibe." I'm going to be talking
> about "the vibe."
>
> In regard to victim selection, you may or may not have
> seen the movie, "Dazed and Confused...." That's a
> character that Matthew McConaughey is playing,
> Wooderson. And Wooderson is a guy who's in his mid-
> 20's who hangs out with the high schoolers. And he
> says, "I love high school girls. I keep getting older,
> and they keep staying the same."[110]

---

[110] R. at 239.

Trial counsel went on to make numerous references to Appellant "putting out the vibe" on his victims.[111]

Trial prosecutorial misconduct is behavior by the prosecuting attorney that oversteps the bounds of that propriety and fairness, which should characterize the conduct of such an officer in the prosecution of a criminal offense.[112]  It is the duty of a prosecutor "to refrain from improper methods calculated to produce a wrongful conviction."[113]  A prosecutor commits prosecutorial misconduct by violating a legal norm or standard.[114] If the prosecutor has committed prosecutorial misconduct, this Court examines the record as a whole to determine whether Appellant was prejudiced by the misconduct.[115]  This Court has adopted a three-part test to measure the impact of prosecutorial misconduct on a trial:

    (1)   The severity of the misconduct;

    (2)   The measures adopted to cure the misconduct; and

    (3)   The weight of the evidence supporting the conviction.[116]

The impact of those violations on the trial determines the appropriate remedy for misconduct.[117]  Where prosecutorial

---

[111] R. at 240, 241, 250.

[112] *United States v. Fletcher*, 62 M.J. 175, 178 (C.A.A.F. 2005).

[113] *Berger v. United States,* 295 U.S. 78, 88 (1935).

[114] *United States v. Meek*, 44 M.J. 1, 5 (C.A.A.F. 1996).

[115] *United States v. Fletcher*, 2005 CAAF LEXIS 1107 (C.A.A.F. 2005); *United States v. Golston*, 53 M.J. 61, 64 (C.A.A.F. 2000).

[116] *Fletcher,* 2005 CAAF LEXIS at *27.

[117] *Meek,* 44 M.J. at 6.

misconduct renders the trial unreliable and unfair, the appropriate remedy is reversal.[118]

In the absence of an objection, this Court reviews for plain error.[119] When trial counsel argues facts not in evidence, or when he discussed the facts of other case, he violates well-settled principles of law.[120] Trial counsel's conduct in this case is remarkable similar to that of the trial counsel in *United States v. Fletcher*, where the Court found that it was plain error for the trial "counsel to refer to Jesse Jackson, Jerry Falwell, Jim Baker, Dennis Quaid, Matthew Perry, and Robert Downey Jr. because there were no facts in evidence regarding any of these individuals and their names were used only for their sensational value."[121] "Trial counsel did not make generalized references to current events to give her argument some context. She made specific references to sensational events not in evidence in order to support her contention that Fletcher was guilty."[122]

In this case, trial counsel compared Appellant, not to actual actors who faced criminal prosecutions, but rather to characters played by famous actors who preyed on high school children. Not one of Appellant's alleged victims was in high school or under the age of eighteen. This error alone warrants

---

[118] *Id.*

[119] *United States v. Rodriguez*, 60 M.J. 87, 88 (C.A.A.F. 2004).

[120] *Id.* at 183.

[121] *Id.* at 183-84.

[122] *Id.* at 184.

21

reversal but it is not the only instance of prosecutorial misconduct in this trial.

During his cross-examination of Appellant, the following exchange took place:

> TC    And your wife is, let's fact it, she's a
>        little bit suspicious [sic] you, isn't s
>        She?
>
> DC    Objection.  Is there any basis for that
>        question, sir?
>
> MJ    I hope you have a good-faith basis for
>        that question, Captain Dreier.  Do you?
>
> TC    I do, and I'm trying to find it in my
>        notes from his testimony, sir.[123]

The military judge instructed the members to disregard trial counsel's question.[124]  But the damage was done.  The members asked if Appellant's wife was suspicious of him being alone with Mrs. Stilson.[125]  They asked why his wife was not present in the courtroom, whether she planned on testifying on Appellant's behalf, and if he was still married to her.[126]

Worse still, despite Captain Dreier's assertion to the court, there was in fact no good faith basis for Captain Dreier's question.  Appellant's wife testified that she was not suspicious of her husband when he was with other women.  "I full [sic] confidence in my husband, that—I don't have to question him."[127]

---

[123]  R. at 739.

[124]  R. at 739.

[125]  R. at 772.

[126]  R. at 774, 776.

[127]  R. at 820, 823.

Trial counsel's conduct is remarkably similar to that of the prosecutor in *Berger v. United States*, where the prosecutor asked a witness about an alleged confrontation with the prosecutor the day before when in fact that confrontation likely never took place.[128]  Like the prosecutor in *Berger*, Captain Dreier had no good faith basis to ask if Appellant's wife was suspicious of him when he was around other women.  The record in this case, specifically the explicit denial of any such suspicion by Appellant's wife, strongly suggests that Captain Dreier's good faith basis was fiction.

And his misconduct continued.  During his closing argument before the members trial counsel opined:

> How did she mess that up, barring some unusual circumstance?  Again, reasonable doubt means you're not thinking aliens are beaming down a tractor beam, the door's popping open or something like that.  She locks the door.  It's locked.  So what's the alternative? Realistic alternatives do not include aliens with tractor beams, or other unknown things...

> Nobody on the planet believes he was returning potato chips at 0230 in the morning.  That is ridiculous.  His wife said that was ridiculous.[129]

As for Appellant's defense, trial counsel commented:

> This kind of thing when you walk up to the door and you go inside and someone's unconscious, all right, that happens in Benjie [sic], Escape from Witch Mountain, and maybe some episodes of Dragnet.  That's a cliche. That's a plot device.  In real life, people don't leave the door open a crack and you walk in, "Oh, my God. Some crime's been committed."[130]

---

[128] *Berger*, 295 U.S. at 87.

[129] R. at 923-24.

[130] R. at 924.

23

[N]o one returns chips at 0230 in the morning.[131]

He then turned took the members to Appellant's home, just as
the military police arrived:

> He opens the door.  He sees PMO.  Now, just put
> yourself mentally—all right. Actually, that's against
> the rules.  Forget I said that.  Staff  Sergeant
> Hernandez opens the door.  He sees PMO in front of him.
> It's not—let's face it.  You've just come from a house
> where there was a woman screaming at you.  PMO shows up
> at your door shortly thereafter.

Disparaging comments directed at the defendant are
improper.[132]  And calling the accused a liar is a dangerous
practice that should be avoided.[133]  In *Fletcher*, trial counsel
told the members that Fletcher had "zero credibility" and that
his testimony was "utterly unbelievable."[134]  Trial counsel
assured the members that, "you know Staff Sergeant Hernandez's
story, not much credibility there."  And he likened Appellant's
defense to "aliens" with "tractor beams" and something that only
happens on television or in the movies.

Further, it is well settled that a jury must not be asked to
place itself in the position of the parties at trial.  Such an
argument is universally condemned because it encourages the jury
to "depart from neutrality and to decide the case on the basis of
personal interest and bias rather than on the evidence."[135]

---

[131] R. at 925.

[132] *Fletcher*,  62 M.J. at 182.

[133] *Id.*

[134] *Id.*

[135] *Spray-Rite Serv. Corp v. Monsanto Co.*, 684 F. 2d 1226, 1246 (7th
Cir. 1982); *Dole v. USA Waste Servs. Inc.*, 100 F. 3d 1384, 1388 (8th
Cir. 1996).

Finally, this Court has found prosecutorial misconduct where trial counsel argued facts not in evidence.[136]  During cross-examination of Appellant's wife, trial counsel asked "Is there any reason why—that you're aware of—why five women would lie about your husband sexually assaulting them?"[137]  He repeated the question two more times.[138]  But Appellant was charged with having indecently assaulted only three women, Lance Corporal Walsh, Corporal Zimmer, and Mrs. Stilson.  And, as addressed in Appellant's petition for new trial, Corporal Zimmer's assault was entirely fabricated.  Thus trial counsel's naked attempt to inflame the passions of the members by grossly inflating Appellant's misconduct was prejudicial error.

In applying the three *Fletcher* factors to this case, it becomes clear that the misconduct by the prosecutor in this case was pervasive and the few remedies afforded Appellant by the military judge were ineffective at curing the taint of Captain Dreier's misconduct.  Finally, the evidence against Appellant boiled down to a collection of fabricated stories, at least two witnesses who perjured themselves, and a simple misunderstanding with Appellant's neighbor.  Had Appellant been afforded a fair trial, one in which his defense was not equated with "aliens" and "tractor beams," there might have been different result.  Because

---

[136] *Fletecher*, 62 M.J. at 184.

[137] R. at 829

[138] R. at 829.

the prosecutorial misconduct rendered Appellant's trial unreliable and unfair, the appropriate remedy is reversal.[139]

The lower court did not address this assignment of error. Instead it disposed of this assignment of error in a footnote to its decision saying that it was without merit.[140]

WHEREFORE, this Honorable Court should grant Appellant's petition because the lower court has decided a question of law in a way in conflict with decisions of this Court. Additionally, the lower court has sanctioned a trial that departs from the normal course of judicial proceedings so as to call for an exercise of this Court's supervisory powers.

### III

THE MILITARY JUDGE ERRED WHEN HE DECLINED TO ADHERE TO THE LIBERAL GRANT MANDATE AND DENIED APPELLANT'S CHALLENGE FOR CAUSE OF GUNNERY SERGEANT [D].

During *voir dire*, Major Curtin stated that he wrote the fitness report for another member, Gunnery Sergeant Duhe.[141]  He further stated that they had served together previously at the company level.[142]  When Major Curtin was reassigned to the battalion Major Curtin, recognizing Gunnery Sergeant Duhe's merits, he had Gunnery Sergeant Duhe moved to the battalion to work for him at his new post.[143]  Major Curtin testified that

---

[139] *Meek*, 44 M.J. at 6.

[140] *Hernandez-Alverado*, No. 200600037 at 2.

[141] R. 186, 211.

[142] R. at 211.

[143] R. at 211.

Gunnery Sergeant Duhe would not be influenced by his presence on the panel.[144]  Trial defense counsel challenged Gunnery Sergeant Duhe for cause because his presence on the panel would raise questions as to the "appearance of legality, fairness, and impartiality" of the panel.[145]  The military judge denied the challenge.[146]

A member should not serve on a court-martial if his presence raises substantial doubt as to the legality, fairness, and impartiality of the court.[147]  The focus of this rule is on the public's perception or appearance of fairness of the military justice system or implied bias.[148]  Military judges must be liberal in granting challenges for cause.[149]  Issues of implied bias are reviewed under a standard of review less deferential than abuse of discretion but more deferential than *de novo*.[150]

It is well settled that a senior-subordinate/rating relationship does not *per se* require disqualification of a panel member.[151]  However, beyond that principle, the Court of Appeals for the Armed Forces "has struggled to define the scope of

---

[144] R. at 211.

[145] R. at 230.

[146] R. at 231.

[147] *See* Rule for Courts Martial, 912(f)(1)(N), Manual for Courts-Martial, United States (1998 ed.).

[148] *United States v. Rome*, 47 M.J. 467, 469 (C.A.A.F. 1998);*United States v. Dale*, 42 M.J. 384, 386 (C.A.A.F. 1995).

[149] *United States v. Smart*, 21 M.J. 15, 21 (C.M.A. 1985).

[150] *United States v. Miles*, 58 M.J. 192, 195 (C.A.A.F. 2003).

[151] *United States v. Wiesen*, 56 M.J. 172, 175 (C.A.A.F. 2001).

implied bias, or perhaps just disagreed on what that scope should be."[152]  But, "at its core remains a concern with public perception and the appearance of fairness in the military justice system."[153]

This case does not involve merely a senior subordinate relationship.  Gunnery Sergeant Duhe was closely tied to Major Curtin because of their past and professional working relationship.  In fact, Major Curtain had handpicked Gunnery Sergeant Duhe to transfer with him when Major Curtain left the company to go and work at the battalion.[154]  His service on the member's panel, with Major Curtin as its president, raises questions as to the appearance of fairness in the military justice system.  The military judge erred when he declined to follow the liberal grant mandate and denied Appellant's challenge for cause.

The lower court did not address this assignment of error.  Instead it disposed of this assignment of error in a footnote to its decision saying that it was without merit.[155]

WHEREFORE, this Honorable Court should grant Appellant's petition because the lower court has decided a question of law in a way in conflict with applicable decisions of this Court.

IV

---

[152] *Id.*

[153] *Id.*

[154] R. at 211.

[155] *Hernandez-Alverado*, No. 200600037 at 2.

THE MILITARY JUDGE ERRED WHEN HE PERMITTED
SERGEANT [K] TO BOLSTER THE TESTIMONY OF MRS.
[S] BY RECOUNTING WHAT SHE TOLD HIM ON THE
NIGHT OF DECEMBER 12, 2003, ON THE GROUNDS
THAT THEIR CONVERSATION WAS AN EXCITED
UTTERANCE BY MRS. [S].

After Appellant allegedly assaulted her, Mrs. Stilson

dressed, and drove to her husband's unit to tell him what had

happened.[156]  Once there, he "comforted me, calmed me down so that

I could tell him what happened.  And then he instructed me to go

talk to the MP's."[157]  She then drove to the guardhouse at the

Basilone Gate and spoke to Sergeant Kiefer.[158]  She arrived at

0330 in the morning, roughly and hour and a half after the

alleged incident.[159]  After five to ten minutes of receiving

preliminary information, Mrs. Stilson told him what happened.[160]

The government sought to have Sergeant Kiefer testify as to

what Mrs. Stilson had told him about the alleged assault on the

grounds that their conversation was an excited utterance.[161]  The

defense objected on the grounds that Mrs. Stilson's conversation

with Sergeant Kiefer was not an excited utterance.[162]  The

---

[156] R. at 338.

[157] R. at 339.

[158] R. at 359.

[159] R. at 359.

[160] R. at 367.

[161] R. at 360.

[162] R. at 359.

military judge overruled the objection and allowed Sergeant
Kiefer to testify about what Mrs. Stilson told him.[163]

This Court reviews a military judge's ruling on the
admissibility of evidence for an abuse of discretion.[164]  An
otherwise inadmissible hearsay statement is admissible under
M.R.E. 803(2) if:

(1) the statement relates to a startling event;

(2) the declarant makes the statement while under the
stress of excitement caused by the startling event,
and;

(3) the statement is spontaneous, excited or impulsive
rather than the product of reflection and
deliberation.[165]

The basis for admissibility of excited utterances "becomes more
tenuous where the exciting influence has dissipated and one has
had the opportunity to deliberate or fabricate."[166]  The existence
of a deliberative period increases the concern that subsequent
statements will be inaccurate or contrived.[167]  Where a statement
relating to a startling event does not immediately follow that
event, there is a strong presumption against admissibility under
M.R.E. 803(2).[168]

In this case, the government did not overcome the
presumption of inadmissibility nor does it satisfy two of the

---

[163] R. at 368.

[164] *United States v. Moolick*, 53 M.J. 174, 176 (C.A.A.F. 2000).

[165] *United States v. Donaldson*, 58 M.J. 477, 482 (C.A.A.F. 2003).

[166] *Id.*

[167] *Id.*

[168] *Id.* at 484.

three required elements for the admissibility of Mrs. Stilson's statements. Mrs. Stilson testified that she drove to her husband's unit where he "calmed her down" so that she could recount the evening's events. By her own testimony, by the time Mrs. Stilson arrived at the guardhouse and hour and a half after the incident, she had calmed down and was no longer laboring under the stress of the incident. And her statement was not spontaneous, excited, or impulsive but was rather the second time she had calmly told her story about what had happened that evening.[169]

The end result was, in a case that was in essence a credibility contest between Appellant and Mrs. Stilson, the government was allowed to impermissibly bolster the testimony of Mrs. Stilson by having Sergeant Kiefer testify that she had told him the same story the night of the incident. It is impermissible to bolster the testimony of a witness unless the testimony is being used to rebut allegations of recent fabrication, or unless the evidence is otherwise admissible under a hearsay exception.[170] Because the defense never argued that Mrs. Stilson had recently fabricated her testimony, and because her statements to Sergeant Kiefer were not admissible as excited utterances, the government was able to impermissibly bolster her testimony with the testimony of Sergeant Kiefer.

---

[169] *See, United States v. Lawrence*, 349 F.3d 109, 119 (3d Cir. 2003); *Galullo v. Federal Express Corp.*, 937 F. Supp 392, 397 (E.D. Pa. 1996).

[170] *United States v. Chandler*, 39 M.J. 119, 124 (C.M.A. 1994).

The lower court did not address this assignment of error. Instead it disposed of this assignment of error in a footnote to its decision saying that it was without merit.[171]

WHEREFORE, this Honorable Court should grant Appellant's petition because the lower court has decided a question of law in a way in conflict with applicable decisions of this Court.

V

> THE MILITARY JUDGE ERRED WHEN HE DECLINED TO GRANT A MISTRIAL WHERE THE GOVERNMENT PROCEEDED TO TRIAL ON CHARGES THAT THE GOVERNMENT KNEW AT THE OUTSET OF APPELLANT'S TRIAL THAT IT WOULD NOT INTRODUCE ANY EVIDENCE TO SUPPORT.

During his opening statement, trial counsel argued that Appellant was a creature of habit, whose misconduct started "in the minor crime zone" and progressed into the "major crime zone."[172]  According to this theory, Appellant's misconduct began in the "minor crime zone"[173] with Corporal Copeland and finished his alleged misconduct in the major crime zone with the incident at the Stilson home.

> So in the end, you'll have to decide, was this a group of women who individually made up respective stories, or did they get together and conspire to make up a bunch of stories about Staff Sergeant Hernandez?  Or is this a creature of habit, someone putting out his vibe in a gradually escalating pattern?[174]

Somewhere in the middle of this "escalating pattern" was Appellant's alleged maltreatment and fraternization with Corporal

---

[171] *Hernandez-Alverado*, No. 200600037 at 2.

[172] R. at 239.

[173] R. at 240.

[174] R. at 250.

Mary A. Ku.[175]  Appellant was charged with violating a lawful

general order by fraternizing with Corporal Ku.[176]  He was also

charged with maltreatment of Corporal Ku by sexually harassing

her.[177]

By the time Appellant's trial began in November 2004,

Corporal Ku had left the Marine Corps and moved to Ohio.[178]  She

was in her third trimester of pregnancy.[179]  As trial counsel

discussed Appellant's "escalating pattern" of misconduct, he

addressed the charges involving Corporal Ku.

> One other thing:  The charges regarding Mary Ku,
> Corporal Mary Ku, have not been addressed here.  She is
> in her third trimester of pregnancy.  She lives in
> Ohio.  We don't know yet if she's actually getting on
> the airplane to come testify tomorrow.  If she does
> not, then those charges are going to have to be
> withdrawn and dismissed, and you won't hear anything
> else about this.[180]

The government proceeded with its case, leaving the charges

involving Corporal Ku before the members.  Several days later,

the government rested its case without having produced Corporal

Ku or any evidence to support the charges.[181]  Pursuant to R.C.M.

917, trial defense counsel moved for a finding of not guilty to

---

[175] A.E. XVIII.

[176] *Id.*

[177] *Id.*

[178] R. at 248.

[179] R. at 248.

[180] R. at 248.

[181] R. at 597.

the two charges and specifications involving Corporal Ku.[182]   The
military judge granted the motion and entered findings of not
guilty.[183]   The military judge instructed the members as follows:

> The government has rested, and true to what they told
> you in opening statement, they were unable to procure
> the presence of Miss Ku, Corporal Mary K. Ku.
> Therefore these charges are no longer before the Court,
> and I've entered a finding of not guilty on these two
> specification...And the fact that these charges were
> preferred and subsequently dropped should not be held
> against the defense in any way.  They are dropped.  The
> government has no evidence.[184]

Trial defense counsel moved for a mistrial because the
government had proceeded to trial on charges it knew it could not
prove.[185]   The military judge asked trial counsel why he proceeded
to trial on the charges, "and mentioned them during opening, even
with your caveat that you may have to get rid of them."[186]   Trial
counsel proffered that he had difficulty in contacting her and
that she was hesitant to fly so late in her pregnancy.[187] He also
proffered that he had not obtained her personal data to obtain a
subpoena and purchase airline tickets.[188]

A judge's failure to grant a motion for mistrial is measured
for an abuse of discretion.[189]   There is no prosecutorial

---

[182] R. at 598.

[183] R. at 598.

[184] R. at 632-33.

[185] R. at 605.

[186] R. at 605.

[187] R. at 606.

[188] R. at 607.

[189] *United States v. Rosser*, 6 M.J. 267 (C.M.A. 1979).

misconduct when a prosecutor, during his opening statement, makes mention of a witness that is not later produced at trial where the record shows that the prosecution acted with a good-faith expectation that such person would testify.[190]  And, "not every variance between the advance description and the actual presentation constitutes reversible error, when a proper limiting instruction has been given."[191]

This case involves not just the mentioning an alleged witness that would not testify at trial, and one whom the government made no real effort to obtain, it also involves proceeding to trial on charges that were identical to the other charges against Appellant without any intent to prove them at trial.  Trial counsel knew when he made his opening statement that Mary Ku, in her third trimester, was not going to be able to fly from Ohio to California for Appellant's trial.[192]  Despite having conversations with Corporal Ku, trial counsel did not obtain the necessary information to issue a subpoena or purchase a plane ticket for her travel.[193]  But trial counsel proceeded to trial because the convening authority has instructed him to "go ahead with everything you can go ahead with."[194]  Trial counsel acted in bad faith when he mentioned Corporal Ku's charges and proceeded to trial on those charges knowing that Corporal Ku's

---

[190] *Frazier v. Cupp*, 394 U.S. 731, 737 (1969).

[191] *Id.* at 736.

[192] R. at 248.

[193] R. at 607.

[194] R. at 607.

legitimate medical concerns about flying during her third trimester of her pregnancy were not going to change as the trial progressed.

Further, the military judge's instruction to the members on this issue was misleading.  Trial counsel, after the military judge had entered findings of not guilty, asked the military judge to not tell the members that there had been a finding of not guilty but rather that the charges were "no longer before the court."[195]  The military judge complied.[196]  While he did inform the members that he had entered findings of not guilty, he also told the members that the charges "are no longer before the court."[197] He further explained that he had taken this action because the government was "unable to procure the presence of Miss Ku."[198]  He described the charges as having been "dropped."[199]

The military judge's ruling was confusing at best and, at worst, outright misleading.  The charges involving Miss Ku were not "dropped" because the government was "unable to procure the presence of Miss Ku."[200]  The clear implication of these statements is that the government had evidence to support the charges involving Miss Ku but that, since she did not show up for trial, the members were not going to hear it.  In fact, Appellant

---

[195] R. at 604.

[196] R. at 632.

[197] R. at 632.

[198] Id.

[199] R. at 632.

[200] R. at 632.

was acquitted of those charges because the government had failed to produce any evidence to support them.  They were not "dropped" or withdrawn as a result of some technicality.

Not surprisingly, the members did not follow the court's instruction.  Despite their instruction to disregard the charges involving Corporal Ku, and after the charges had been "dropped," the members asked questions about her.  "Did you or Staff Sergeant Hernandez ever document or counsel Corporal Copeland or Corporal Ku on their poor performance or their alleged poor performance?"[201]  Did Staff Sergeant Hernandez give Corporal Ku pros and cons?[202]  "Do you recall recommending proficiency and conduct marks for Corporals Ku and Copeland?"[203]  "You stated that Corporal Copeland made many job-related errors and Corporal Ku was a bad Marine?"[204]  "How did you discipline Corporal Copeland and Corporal Ku?"[205]  "Why do you think Corporal Ku and Corporal Copeland were substandard Marines?"[206]  "Did you ever place Corporal Ku and/or Corporal Copeland in charge of something or to do something for you?"[207]  "If so, why did you do that if you couldn't trust them and say that they couldn't tell the truth?"[208]

---

[201] R. at 854.

[202] R. at 854.

[203] R. at 855.

[204] R. at 855.

[205] R. at 855.

[206] R. at 856.

[207] R. at 856.

[208] R. at 856.

"Did you or Staff Sergeant Hernandez ever recommend a page 11, a 6105, or NJP for Corporal Ku, Corporal Copeland, or Lance Corporal Castaneda?"[209]  "Did you or Staff Sergeant Hernandez ever write counseling sheets for Corporal Ku, Corporal Copeland, or Lance Corporal Castaneda?"[210]

The government successfully put before the members charges that would never be proven but, as the questions posed by the members demonstrate, where considered in determining Appellant's guilt.  This offends basic notions of fairness encompassed in Due Process and Appellant's right to confront his accusers.  Because the government acted in bad faith in proceeding to trial on these charges, and because the limiting instruction given by the military judge was wholly ineffective, the military judge abused his discretion when he denied Appellant's motion for a mistrial.

The lower court did not address this assignment of error. Instead it disposed of this assignment of error in a footnote to its decision saying that it was without merit.[211]

WHEREFORE, this Honorable Court should grant Appellant's petition because the lower court has decided a question of law in a way in conflict with applicable decisions of this Court.

---

[209] R. at 858.

[210] R. at 858.

[211] *Hernandez-Alverado*, No. 200600037 at 2.

38

Respectfully submitted,

BRIAN L. MIZER
LT, JAGC, USN
Bar No. 33030
Appellate Defense Counsel
Navy-Marine Corps Appellate Review Activity
716 Sicard Street, SE, Suite 1000
Washington Navy Yard, D.C. 20374
(202) 685-7290

**APPENDIX**

*United States v. Hernandez-Alverado*, No. 200600037 (N-M. Ct. Crim. App. 2006).

**CERTIFICATE OF COMPLIANCE WITH RULE 24(d)**

1.   This brief complies with the type-volume limitation of Rule 24(d) because this brief contains 7,607 words and 952 lines of text.

2.   This reply brief complies with the typeface and type style requirements of Rule 37 because this brief has been prepared in a monospaced typeface using Microsoft Word Version 2003 with 12-point Courier font.

BRIAN L. MIZER
LT, JAGC, USN
Bar No. 33030
Appellate Defense Counsel
Navy-Marine Corps
Appellate Review Activity
716 Sicard Street, S.E., Suite 1000
Washington, D.C. 20374
(202) 685-7396

**CERTIFICATE OF FILING AND SERVICE**

I certify that the original and seven copies of the forgoing were hand delivered to the Court on November 27, 2006, and that a copy was hand delivered to Appellate Government Division, and to Director, Administrative Support Division, Navy-Marine Corps Appellate Review Activity on November 27, 2006.

Respectfully submitted,

BRIAN L. MIZER
LT, JAGC, USN
Bar No. 33030
Appellate Defense Counsel
Navy-Marine Corps Appellate Review Activity
716 Sicard Street, SE, Suite 1000
Washington Navy Yard, D.C. 20374
(202) 685-7290

40

# United States Court of Appeals for the Armed Forces
## Washington, D.C. 20442-0001

| | | |
|---|---|---|
| UNITED STATES, | ) | USCA Dkt. No.  07-0121/MC |
| | ) | Crim.App. No.  200600037 |
| Appellee | ) | |
| | ) | |
| v. | ) | ORDER DENYING PETITION |
| | ) | AND |
| | ) | PETITION FOR NEW TRIAL |
| David A. | ) | |
| HERNANDEZ-ALVERADO, | ) | |
| Appellant | ) | |

On consideration of the petition for grant of review of the
decision of the United States Navy-Marine Corps Court of
Criminal Appeals and the petition for new trial, it is by the
Court this 28th day of June, 2007,

ORDERED:

That the petition for grant of review and the petition for
new trial be, and the same are hereby denied.

For the Court,


/s/ William A. DeCicco
Clerk of the Court


cc:  The Judge Advocate General of the Navy
     Appellate Defense Counsel (MIZER)
     Appellate Government Counsel (MATTIOLI)

4

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing pleading was this date served upon all counsel of record by delivering a copy in person to the United States Attorney's office and by sending a copy via FedEx overnight to both the Respondent and the United States Attorney General:

**The Honorable Karen P. Hewitt**
United States Attorney
Office of the US Attorney – Southern
District of California
880 Front St., Room 6293
San Diego, CA 92101-8893

**The Honorable Michael B. Mukasey**
United States Attorney General
Department of Justice
950 Pennsylvania Ave., N.W.
Washington, D.C. 20530-0001

**The Honorable Donald C. Winter**
Secretary of the Navy
Department of the Navy
1000 Navy Pentagon
Washington, D.C. 20350-1000

San Diego, CA this 2nd day of July, 2008.

_____

*Service Agent,*
*for Petitioner.*

Faxed

JS 44 (Rev. 12/07)

# CIVIL COVER SHEET   FILED

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**I. (a) PLAINTIFFS**

Hernandez-Alverado, David, A.

**(b)** County of Residence of First Listed Plaintiff   San Diego County, CA
(EXCEPT IN U.S. PLAINTIFF CASES)

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

David P. Sheldon; The Law Offices of David P. Sheldon, PLLC
512 8th Street, S.E., Washington, D.C. 20003; (202) 646-9575

**DEFENDANTS** CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
Secretary Donald C. Winter,
Department of the Navy
BY                                            DEPUTY
County of Residence of First Listed Defendant
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

Attorneys (If Known)

## 08 CV 1184 JM AJB

**II. BASIS OF JURISDICTION** (Place an "X" in One Box Only)

☐ 1 U.S. Government Plaintiff
☐ 3 Federal Question (U.S. Government Not a Party)
☒ 2 U.S. Government Defendant
☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (Place an "X" in One Box for Plaintiff and One Box for Defendant) (For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 196 Franchise | | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | ☐ 791 Empl. Ret. Inc. Security Act | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☒ 530 General | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | **IMMIGRATION** | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | ☐ 463 Habeas Corpus - Alien Detainee | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | ☐ 465 Other Immigration Actions | | |

**V. ORIGIN** (Place an "X" in One Box Only)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

**VI. CAUSE OF ACTION**
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
28 U.S.C. section 2241
Brief description of cause:
Petition for Writ of Habeas Corpus

**VII. REQUESTED IN COMPLAINT:**
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $
CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes ☒ No

**VIII. RELATED CASE(S) IF ANY** (See instructions):
JUDGE                                DOCKET NUMBER

DATE
06/30/2008
SIGNATURE OF ATTORNEY OF RECORD
David P. Sheldon

FOR OFFICE USE ONLY

RECEIPT # 152591   AMOUNT $ 350   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____
TAC 7/2/08

**UNITED STATES
DISTRICT COURT**
SOUTHERN DISTRICT OF CALIFORNIA
SAN DIEGO DIVISION

# 152591    — TC

July 02, 2008
16:12:57

**Civ Fil Non-Pris**
USAO #.: 08CV1184
Judge..: JEFFREY T MILLER
Amount.:
Check#.: BC5071                    $350.00 CK

Total—>  $350.00

FROM: HERNANDEZ -ALVERADO, DAVID
VS
SECRETARY DONALD C. WINTER